Whitney and others vs. Gunderson.

WHITNEY and others vs. GUNDERSON

PUBLIC LANDS. (1) *Act of congress confirming land claim, construed.* (2) *No adverse possession against government.* (3, 4) *When lands granted by U. S. become taxable.* (5) *To whose benefit patent enures.*

TAX DEED. (6) *Description of premises.* (7) *Who may acquire tax title.*

31  359<br>86  547

1. Acts of congress for the confirmation of land claims, which expressly provide that such confirmations shall not be construed to extend "to any lands occupied by the United States for military purposes," must be construed as not confirming any claim within the limits of any tract belonging to the United States which was uniformly regarded and treated by the executive department of the federal government as a "military reservation," even though the same was not actually occupied by soldiers.

2. There can be no adverse possession of lands belonging to the govern- ment; and where plaintiff in ejectment claims under a grant from the United States, the occupation of the land by defendant, under claim of exclusive right, for any number of years before the govern ment parted with either the legal or equitable title, is no bar to a re covery.

3. Land which has belonged to the federal government does not become subject to taxation under the laws of the state, until the specific tract

has been, by some act of the government, segregated from the body of the public lands, and at least an equitable title thereto vested in the grantee.

4. An act of congress, in 1860, declared that the title to a certain tract of land confirmed to P. G. by certain commissioners appointed under a former act, described as "a parcel of ground lying on the west side of the Fox river, at Green Bay, immediately below the first creek that empties into said river, about fifteen acres in front on said river, and extending back indefinitely," was thereby ratified and confirmed; and that the commissioner of the general land office should cause said tract to be surveyed in the same manner as other private claims to lands at Green Bay had been surveyed, and that he be required to issue a patent thereon, etc. *Held*, that the specific land granted by this act was not ascertained and separated from other lands, so as to be subject to taxation, *until after the survey was made* and approved by the executive department of the government.

5. Said act provides that the patent for said land shall issue to P. G., subject to such legal transfers or assignments as may have been made by him or his heirs or legal representatives at any time subsequently to the confirmation of his claim by certain commissioners in 1823. Plaintiffs claim under deeds, *without warranty*, from the heirs of P. G., made between 1823 and 1860, to wit: (1) a deed of bargain and sale from two of said heirs, which conveys all the grantors' property, interest, claims or demands, real or personal, which descended to them as heirs of P. G., and constitutes the grantee their attorney, for them and in their name to prosecute all actions, "real, personal or mixed, for any goods, chattels, * * * demands, rights, property, cause or thing whatsoever, due or belonging, or to be due or belonging [to said grantors], or that may be demanded by them * * * in any court of law or equity, or in any other place whatsoever," as heirs of said P. G. (2) A deed from three other of said heirs of all their "right, title, interest, estate, claim and demand, both at law and in equity, and as well in possession as expectancy, of, in and to" said lot confirmed to P. G. (3) A deed from other heirs, conveying "a claim of P. G." (describing it), the interest conveyed being declared to be that claimed by the grantors as the heirs, etc. *Held*, that the patent to P. G. and his heirs enured to the benefit of the plaintiffs.

6. Where a certain tract of land was commonly known and described as the "vacant strip," and was so assessed for taxation, a description in a tax deed of a part thereof sold for taxes, as the "north one-third of the north half of the vacant strip," *held* sufficient; and this in a case where the northerly and southerly boundaries (which were parallel) deflected largely from a due east and west line.

7. Where it appears that one was in possession of land, claiming title thereto, when certain taxes accrued, it must be presumed that the land was assessed to him, and that he was under obligation to pay the taxes, and could not acquire title by a sale and deed for such taxes.

APPEAL from the Circuit Court for *Brown* County.

Ejectment, brought by *Emmeline S. Whitney*, widow and devisee of Daniel Whitney, *James S. Baker* and *Louis B. Porlier*. The last named is described in the title of the cause, as "administrator of the estate of Augustin Grignon, deceased," but there is no averment in the complaint as to his representative character. Plaintiffs claimed that the land in dispute was part of a tract granted to Pierre Grignon, and for which a patent was issued to him and his heirs by the United States, June 2, 1870, in pursuance of an act of congress approved June 13, 1860 (12 U. S. Stats. at Large, p. 857, ch. 125). This act declares that "the titles to certain tracts of land at Green Bay, Wisconsin, confirmed to Francis Lavonture and Pierre Grignon by the commissioners appointed under the act of congress approved February 21, 1823, * * * * are hereby ratified and confirmed," etc. It describes the tract confirmed to Pierre Grignon as follows : "a piece or parcel of ground lying and being on the west side of Fox river, Green Bay, immediately below the first creek that empties into said river, about fifteen acres in front on the said river and extending back indefinitely." It then provides that the commissioner of the general land office shall "cause the said tracts of land to be surveyed in the same manner as other private claims to lands in Green Bay have been surveyed ; and that he be required to issue patents thereon to and in the names of the aforesaid Francis Lavonture and Pierre Grignon, respectively, subject to such legal transfers and assignments as may have been made by them, or either of them, or their heirs or legal representatives, at any time subsequent to the confirmation to them, respectively, by the said commissioners, according to the fifth section of said act of 1823." The

patent recites these latter provisions of the statute, and declares that the grant therein made is subject to the conditions thus recited. It appears that Pierre Grignon died soon after his claim was entered.

The plaintiffs put in evidence, 1. The patent above mentioned. 2. A plat which is referred to in the patent as "a plat of official survey of said claim, approved June 30, 1869, by the commissioner of the general land office and *ex officio* surveyor general of Wisconsin, whereby it appears that said claim [of Pierre Grignon] is bounded on the north by lot No. 1 confirmed to Jacques Porlier, on the east by Fox river, on the south by vacant strip confirmed to Alexis Gardapier, and west by lot 111 of Fort Howard reservation," etc. On this plat are delineated several tracts of land all abutting, at their eastern end, on the Fox river. Beginning at the south and proceeding northward, they are: (1) "Lot No. 2 as confirmed to Louis Grignon." The northern boundary of this lot strikes the Fox river at a point which is also the point of junction with said river of the north side of a certain bayou, slough or creek, designated "1st Creek;" and a post at this point is described on the plat as "Post at mouth of bayou — corner to Lot No. 2 and Military Reservation." (2) "Part of Lot No. 2 as claimed," marked as 3.83 chains in width. (3) "Vacant strip confirmed to Alexis Gardapier," marked as 8.73 chains in width. (4) "Part of vacant strip confirmed to Pierre Grignon," marked as 4.05 chains in width. (5) "Lot No. 1 confirmed to Jacques Porlier." The plat contains the following note: "Jacques Porlier claim surveyed June, 1846, by A. G. Ellis, Dep. Sur., under contract of June 12, 1846. Louis Grignon claim confirmed by board of commissioners and surveyed in 1828 by John Mallet, Dep. Sur." And upon the plat is the following certificate: "The above is a correct plat of survey executed by Fred S. Ellis, D. S., under contract of May 25, 1868, and special instructions from the commissioner general land office of June 5, 1868, of the tract of land known as the vacant strip

claimed by Alexis Gardapier, and part of vacant strip on the north side of said tract claimed by Pierre Grignon, situated on the west side of Fox River in T. 24 N., R. 20, E. 4th P. M., Wisconsin, formerly embraced in the Ft. Howard Reservation; is strictly conformable to the field notes of survey thereof, which have been examined and approved.    General Land Office, June 30th, 1869.    (Signed) Jos. S. WILSON, Commissioner and *ex officio* Sur. Gen'l Wisconsin."    3.    A deed from Paul and Amable Grignon and their wives to Daniel Whitney, dated July 28,.1832.    This deed, after granting other lands, recites that the grantors are indebted to the grantee in the sum of $3,500, and for the satisfaction of this indebtedness and for "divers other good causes and considerations," they "give, grant, assign, bargain and sell" to him and to his heirs and assigns forever all the real and personal property which descended to them or either of them as heirs or legatees "of the late Pierre Grignon and Domitelle Longvine  *  *  * and of which the said Pierre Grignon, the father, and Domitelle Longvine, the mother, died seized and possessed," etc.    There is added a covenant for further assurances, etc.; and the grantee is then constituted by the grantors their attorney to commence and prosecute any action, "real, personal or mixed, for any goods, chattels, debts, duties, demands, rights, property, cause or thing whatsoever, due or belonging, or to be due or belonging, unto the said parties of the first part, or to be demanded, or that may be demanded, by them or either of them, in any courts of law or equity, or in any other court or place whatsoever, as heirs or legatees as aforesaid of Pierre Grignon and Domitelle Longvine," etc., with power of substitution.    4.    Deeds (executed in 1833) from three other heirs of Pierre Grignon (with their husbands and wives, respectively) conveying to Daniel Whitney "all our, and each of our, right, title, interest, estate, claim and demand both at law and in equity, and as well in possession as expectancy, of, in and to all that certain lot of land lying and being on the

west side of Fox river, in the township of Green Bay, immediately below the first creek that empties into said river, and extending back indefinitely *  *  * ; which said lot was confirmed to the said Pierre Grignon by the commissioners at Detroit, November 1, 1823." 5. A deed (executed in 1850) from two grandsons of said Pierre Grignon, and their wives, to Daniel Whitney, conveying "a claim of Pierre Grignon, senior, on the west side of Fox river, within the military reservation of Fort Howard, and described as commencing at the first creek which empties into Fox river above Fort Howard, running down stream fifteen acres in front on Fox river and extending back indefinitely; the interest hereby conveyed being that claimed by the parties of the first part as heirs at law of Pierre Grignon, junior, deceased." 6. A deed (executed in 1858) from other heirs to *James S. Baker.* This deed is similar in character to the preceding. 7. The last will and testament of Daniel Whitney, admitted to probate in 1862, by the first clause of which he devises to his wife, *Emmeline S. Whitney,* all his "messuages, lands, tenements and hereditaments of all and every description, tenure and title, and wherever situated," of which he shall be possessed at the time of his death; "it being my intention to give my said wife all my real estate to the full extent of my right, title or interest therein," etc. 8. Proof of the appointment of the plaintiff *Louis B. Porlier* as administrator of the estate of Augustin Grignon, deceased, one of the heirs of Pierre Grignon. 9. Evidence that defendant was in possession of the tract in dispute, and that the same is part of the land patented to Pierre Grignon and his heirs.

Defendant, in addition to a general denial of plaintiffs' claim, alleged that he and those under whom he claimed had possessed and occupied the premises for more than twenty years before the commencement of the action, under a claim of title exclusive of any other right, founded upon a written instrument as being a conveyance of said premises. In support of his answer he introduced, against plaintiffs' objections, the following

evidence: 1. American State Papers, Public Lands, vol. 4, p. 721, showing the original claim of Pierre Grignon, entered February 4, 1823. The land claimed is described in the same words as are used in the act of June 15, 1860, and in the patent above mentioned. The claim is confirmed under date November 21, 1823, by.the commissioners appointed under the act of congress of February 21, 1823, on condition that it shall not interfere with the confirmations made to Jacques Porlier and Alexis Gardapier. 2. Same volume, pp. 722, 723, showing the claim of Alexis Gardapier, entered September 16, 1823, and affidavits in support thereof, and that the commissioners aforesaid, upon these affidavits, decided (under date November 21, 1823), that the tract so claimed should be confirmed to said Alexis Gardapier, provided the same should not interfere with any confirmation previously made. The land so claimed is described as " a certain tract of land lying on the west bank of Fox river, and more particularly known as being a vacant strip lying between a tract number *one*, confirmed to Jacques Porlier, on the north, and tract number *two*, confirmed to Louis Grignon, on the south, commencing at low water-mark, and running west eighty arpens and in width three arpens on the aforesaid river." 3. Same volume, map between pp. 852 and 853. This map is called a " Plan of the Settlement of Green Bay, from the report of I. Lee, Esq., Agent, etc., not founded on actual survey." It purports to delineate the private claims to lands on each side of the Fox river at Green Bay, and to show which of the claims were, and which were not, confirmed by the commissioners acting under an act of congress of May 11, 1820 ; under which act also Mr. Lee had been employed as agent to receive and record claims of that character and take evidence in their support. On this map or plan, between Lot No. 1 on the west side of Fox river, confirmed to Jacques Porlier, and Lot No. 2, confirmed to Louis Grignon, there is delineated a narrow strip of land designated as " vacant land." 4. An act of congress,approved April 17, 1828. Sec. 2 of this

act declares that the claims purporting to be confirmed or recommended for confirmation, by the commissioners under the act of February 21, 1823, are thereby confirmed. Sec. 3 pro-vides that the act shall not be so construed as to prejudice the rights of third persons, nor shall the confirmations made by it "be so construed as to extend further than to a relinquishment by the United States of all interest in said lands, nor to any lands occupied by the United States for military purposes." 5. A series of quitclaim deeds, the first dated in 1824 and the last in 1828, conveying to John P. Arndt the title of Alexis Gard-apier in the "north half of a tract or parcel of land on the west bank of Fox river, in the county of Brown, more particu-larly known and represented as being a vacant strip of land on the chart or sketch of private claims at Green Bay, exhibited to the commissioners at Detroit under the act of congress of April 11 [May 11], 1820." 6. A series of deeds (commencing with one executed by said John P. Arndt in 1835), by which it would seem that whatever title said John P. Arndt had in the "middle one-third" and the "north one-third" of the north half of the "vacant strip" between Lots Nos. 1 and 2 above mentioned, vested in Elisha Morrow, to wit, the title to the "middle one-third" June 12, 1862, and that to the "north one-third" April 22, 1863. Defendant claims under said Mor-row. 7. A deed from Alexis Gardapier and wife to Daniel Whitney, in 1830, of the "undivided south half of a certain tract or parcel of land, lying and being on the west bank of Fox river, in the county of Brown, bounded on the north by lands owned by Jacques Porlier, on the south by lands owned by Louis Grignon, and on the east by Fox river, containing a front on said river of three arpents, more or less, and extending west eighty arpents, and more particulary known and represented as being a vacant strip of land on the chart or sketch of private claims at Green Bay, exhibited to the com-missioners at Detroit, under the act of congress of April 11 [May 11], 1820;" and also a deed of the same land from Daniel

Whitney to John W. Arndt, executed in 1853 in obedience to a decree of the circuit court for Brown county, in an action brought by John W. Arndt against Daniel Whitney and others. The record and decree in said action were put in evidence, and said John W. Arndt testified that the action arose out of a question between him and Whitney as to how much land there was in the " vacant strip," witness claiming that it included all the land between lots 1 and 2, while Whitney had previously tendered him a deed for only a breadth of three arpents. 8. Testimony tending to show that John P. Arndt, and afterwards his son John W. Arndt, and those claiming under them, had been in actual possession of the premises in dispute since 1825 ; that the same was not occupied or used for any purpose after that date by the garrison of Ft. Howard ; and that the whole of the land between " Lot No. 1, confirmed to Jacques Porlier," and " Lot No. 2, confirmed to Louis Grignon," was known after the year 1858 (as well as before that time) as the " vacant strip," and was so assessed for purposes of taxation. 9. Tax deeds as follows : (1) Dated April 25, 1871, based on tax sale of 1863, purporting to convey the " middle one-third of north half of vacant strip, containing 54 and 56-100 acres," and running to Elisha Morrow. (2) Dated September 9, 1865, based on sale of 1862, purporting to convey the " north one-third of the north half of the vacant strip, containing 54 and 56-100 acres," and running to Joseph S. Curtis. (3) Dated May 22, 1866, based on sale of 1863, purporting to convey " the north one-third of the north half of private claim called vacant strip, containing 54 and 56-100 acres," and running to Joseph S. Curtis. (4) Dated July 24, 1867, based on sale of 1864, containg the same description of the land conveyed as that in No. (2) above, and running to Mary G. Curtis. (5) Dated September 7, 1864, based on sale of 1861, purporting to convey " the north half of the vacant strip, containing 51 and 50-100 acres," and running to Joseph S. Curtis. Also deeds from Joseph S. and Mary G. Curtis, releasing to Elisha Morrow their respective rights under the tax

deeds (2), (3) and (4), above mentioned. 10. Sundry records of partition suits, and other items of evidence, which do not seem important here. 11. An act of congress approved December 11, 1866, confirming the claim of Alexis Gardapier to a certain tract of land described as follows : Lying on the west bank of Fox river and more particularly known as being a vacant strip lying between a tract numbered *one*, confirmed to Jacques Porlier, on the north, and tract numbered two, confirmed to Louis Grignon, on the south, commencing at low water mark, and running west eighty arpents, and in width three arpents on the aforesaid river."*

To rebut defendant's evidence plaintiffs called as a witness Fred. S. Ellis, who testified that he was employed by the government of the United States, in June, 1868, to survey the Alexis Gardapier and Pierre Grignon tracts, and made the survey in accordance with his instructions from the Department of the Interior. A copy of these instructions was put in evidence. They describe the land within which said two tracts were situate as having been "formerly embraced within Ft. Howard Military Reservation." They state that said land has "for its southern boundary, the northern limit of Lot No. 2 as surveyed for Louis Grignon by John Mullett, U. S. Deputy Surveyor, in August, 1828, and not as reported by board of commissioners, November 1, 1823, for the reason that at the time the survey was made by Mr. Mullett, that part of Lot No. 2 as claimed and confirmed to Louis Grignon, and shown on the diagram as being 3.83 chains in width, was not surveyed, being within the military reservation, and was required for the purposes re-

---

*The fact *seems* to have been that the north line of the Louis Grignon tract (Lot No. 2) and the south line of the Porlier tract (Lot No. 1), as *determined by survey* before the lands were patented, were respectively farther north and farther south than had previously been generally supposed; and that the strip of land between them was consequently considerably wider than had been supposed, and wider than it was represented on the " plan " made by Mr. Lee in 1821, and put in evidence by the defendant.—REP.

served. They declare that said last mentioned strip must be kept out of the surveys for Pierre Grignon and Alexis Gardapier; that the surveyor must survey first the tract of said Gardapier, because the confirmation to Pierre Grignon was coupled with a proviso that it should not interfere with the confirmations made to Jacques Porlier and said Gardapier. After specific directions as to the manner of surveying the Gardapier claim, with a width of 8.73 chains, the surveyor is then instructed as follows: " The residue of the vacant strip, lying between Alexis Gardapier's claim on the south and that of Jacques Porlier, Lot No. 1, on the north, being the only available and applicable land for the location of the Pierre Grignon claim, you will survey by establishing meander lines of the west bank of Fox River, between the northeast corner of Alexis Gardapier's claim and the southeast corner of Jacques Porlier's claim as aforesaid, and after ascertaining * * the width of the residue of said vacant strip, and restoring missing corners of Porlier's claim, constituting common corners to Pierre Grignon's claim, * * * you will calculate the area of this claim," etc.

The plaintiffs asked the following instructions to the jury, all of which were refused: 1. That the act of congress approved February 21, 1823, entitled, etc., and the subsequent action of the commissioners appointed under it, recommending the claim of Pierre Grignon for confirmation by congress, was the inception of a *donation right*, in favor of said Grignon, to a quantity of land not exceeding 640 acres; which right was inheritable and subject to devise and transfer as property by said Grignon and his heirs. 2. That the act of congress approved June 13, 1860, entitled, etc., confirmed such right, subject to all legal transfers made by said Grignon or his heirs subsequent to the date of the report of the commissioners, to wit, November 1, 1823. 3. That the conveyance for a valuable consideration produced in evidence, from the heirs of Pierre Grignon to Daniel Whitney and *James S. Baker*, and the will of Daniel Whitney, by which he devised to *Emmeline S. Whitney*, one of

the plaintiffs, all his estate, real and personal, were legal trans-
fers in contemplation of the act of June 13, 1860; and the
patent bearing date June 2, 1870, issued in pursuance of said
act, took effect, by relation, on the 1st day of November, 1823,
and enures to the benefit of the transferees.   4. That the fee
of the land claimed in this action was in the United States until
the same was divested by the issue of a patent.   5. That both
parties claiming title derived from the United States, the pos-
session of the defendant cannot be construed to be adverse to
the plaintiffs.   6. That until the survey under authority of the
United States, severing the lands conveyed by patent from ad-
joining unsurveyed lands, and the legal possession thereof by
a person having some title or interest therein, derived from the
government, the lands described in the patent were not subject
to taxation under the laws of the state.   7. That the lands in
dispute being claimed by defendant to have been in possession
of Elisha Morrow and those claiming under him, all deeds upon
sales for taxes levied while in his or their possession, executed
to him, are of no validity as against any person claiming title
under a patent subsequently issued.   8. That the tax deeds
offered in evidence in this cause are void as against plaintiffs,
for want of a legal description of the lands claimed by them.   9.
That the tax deeds offered in evidence in this cause, if valid in
other respects, convey only such right or title as was held by
the occupants of the lands described therein at the time they
were assessed to them.   10.   That if plaintiffs represent any of
the heirs of Pierre Grignon, or derived title from any of the
heirs by legal transfer executed since the first of November,
1823, to any shares or interest in the land in dispute, then they
are entitled to a verdict in their favor for the shares or interest
so represented or transferred.

The jury, by direction of the court, brought in a verdict for
the defendant; and from a judgment entered upon such verdict
the plaintiffs appealed.

*M. L. Martin* and *Bromley & Vroman*, for appellants, argued,

1. That the *patent* is the highest evidence of title, and conclusive in this action. *Jackson v. Lawton,* 10 Johns., 23; 4 id., 162; *U. S. v. Stone,* 2 Wall., 525; Burnett, 13; 3 Chand., 210; 4 Wis., 554; 8 id., 287; 13 Peters, 436; 20 How. (U. S.), 558; 13 id., 18; 9 id., 356; 16 id., 48; 17 id., 413; 24 id., 184; 6 Pick., 408; 13 Cal., 417; 14 id., 361; 18 id., 535; 1 McAll., 401; 3 Washb. on R. P., 174, 175, 179, and cases there cited. 2. That the conveyances from the heirs of the patentee to Whitney and *Baker,* and the will of Whitney, are legal transfers of the estate granted by the patent. 12 Stats. at Large, p. 857; 5 id., 31; 2 How., 284; 10 id., 348, 372, citing Vin. Abr., 290; 3 Cow., 75; 5 Cruise, 510, 511; 11 Wis., 3. 3. That the right of action did not accrue until after the patent issued, and the action was then properly brought in the name of *Louis B. Porlier,* administrator, for the share belonging to his intestate, who was one of the heirs of the patentee. R. S., pp. 591, 839; 16 Wis., 181; 20 id., 381; 21 How., 481; 3 Washb. on R. P., 178. 4. That there can be no adverse possession against the government or its grantees. 28 Barb., 240; 8 id., 189; 10 id., 120; 12 id., 201; 6 Pick., 408; 2 Johns., 80; 8 id., 28; 9 id., 163; 16 How., 48; 20 Ga., 467; 26 id., 590; Tyler on Ejectm., 105, 146, 784, 944. 5. That the tax deeds put in evidence by defendant were not available to show title in him. (1.) They bear date prior to the patent, which negatives the idea of the taxability of the lands. 20 Wis., 449; 1 McAll., 401; 17 How., 403. (2.) They are void for want of a description of the premises. 3 Wis., 816; 13 id., 641; 20 id., 228, and cases there cited; 22 id., 167; 23 id., 102; 25 id., 494; 13 How., 18. (3.) Morrow, having been in possession at the time, could not acquire title by tax deed. 22 Wis., 175; 24 id., 229.

*Neville & Tracy,* for respondent:

1. According to plaintiffs' own showing, no one of them has any title to the premises in dispute. (1.) The land was patented to "Pierre Grignon and his heirs," June 2, 1870. Pierre Grignon died in 1823. The plaintiffs *Mrs. Whitney* and *Baker*

claim under conveyances from the heirs. That clause in the deed of Paul and Amable Grignon which is claimed to include the land in controversy, conveys only the lands of which Pierre Grignon "died seized and possessed." But according to plaintiff's evidence the title was in the United States, and there was no evidence offered to show possession by Grignon at the time of his death. (2.) The conveyances from the other heirs to Whitney and *Baker* were by quitclaim deeds, the last of which was dated May 1, 1858. Title subsequently acquired by the grantor does not enure to the benefit of the grantee in such a deed. The deed from Paul and Amable is also merely one of bargain and sale, without warranty; and the same rule applies to it. *Jackson v. Wright*, 14 Johns., 193; *Jackson v. Hubble*, 1 Cow., 613; *Sparrow v. Kingman*, 1 Coms., 242, 247; *Van Rensselaer v. Kearney*, 11 How. (U. S.), 297, 322. (3.) The plaintiff *Porlier*, though described in the title of the cause as administrator, etc., does not claim, in the complaint, to sue in a representative character. He must be held, therefore, to have sued in his own right (*Grantman v. Thrall*, 44 Barb., 173; *Fowler v. Westervelt*, 40 id., 374; *Merritt v. Seaman*, 2 Seld., 168); but no title in him in his own right is claimed. 2. The defendant proved a perfect title in Elisha Morrow, under whom he has possession. The evidence shows that the land in controversy is a part of a tract commonly known as the "vacant strip," embracing all the land between Private Claims No. 1 and 2 on the west side of Fox river; that this strip was entered by Gardapier in 1823; that the commissioners decided in favor of confirming the claim (Am. State Papers, Pub. Lands. vol. 4, pp. 722, 723, and map between pp. 852 and 853); and that the claim was confirmed by act of congress (4 U. S. Stats. at Large, 260). This confirmation vested an absolute title in Gardapier. *Grignon v. Astor*, 2 How. (U. S.), 319, 344; *Challefoux v. Ducharme*, 8 Wis., 288. Such confirmation is of a higher nature than a patent — the former being the deliberate act of the government itself, the latter only

the act of its ministerial officers. *Grignon v. Astor, supra.* The description of the land so confirmed to Gardapier covers the tract between Lots 1 and 2, the language "between Lot 1 on the north and Lot 2 on the south" being equivalent to "bounded by Lot 1 on the north, and by Lot 2 on the south." Metes and bounds control distances in a deed. *Jackson v. Barringer*, 15 Johns., 471; *Jackson v. Camp*, 1 Cow., 605; *Doe v. Thompson*, 5 id., 371; *Jackson v. Frost*, id., 346; *Jackson v. Ives*, 9 id., 661; *Wendell v. Jackson*, 8 Wend., 183; *Smith v. McAlister*, 14 Barb., 434. 4. The title passed out of the government either to Gardapier or Grignon, in 1823. 4 Stats. at Large, 260; *Grignon v. Astor*, and *Challefoux v. Ducharme, supra.* Gardapier conveyed away the whole tract in 1824. The evidence shows that the whole tract between Lots 1 and 2 has been actually occupied ever since 1826, by persons claiming title to the whole under Gardapier. 5. The plaintiffs claim that the grant by the act of April 17, 1828, is inoperative as to the claims of Gardapier and Grignon, because the lands were a part of the military reservation. The burden of proving this fact is upon them, and it is not shown. The act exempts lands actually "occupied by the United States for military purposes;" and there is no proof that these lands were so occupied. On the contrary, the proof is that the United States troops withdrew to the land north of Lot 1 as early as 1826. The plaintiffs' claim is therefore barred under secs. 2, 6 and 10, ch. 138, R. S. 6. The claim of the plaintiffs is defeated by the tax deeds put in evidence. (1) Conceding that Morrow could not acquire a tax title to the land, there can be no objection to his receiving a quitclaim from any person having or claiming title by tax deed. The deed of September 9, 1865, to Joseph S. Curtis, and that of July 24, 1867, to Mary G. Curtis, each vested in the grantee an estate in fee simple in the land. That title was released to Morrow pursuant to sec. 40, ch. 22, Laws of 1859. (2) The tax deed of May 22, 1866, to Joseph S. Curtis is a complete bar to plaintiffs'

claim, as the title is thereby shown to be in the grantee there named.    7. The record and decree in the partition suit between Arndt and Whitney establish the fact that the Gardapier claim, or "vacant strip," included all the lands between Lots 1 and 2; and the decree binds *Mrs. Whitney.*

The following opinion was filed at the January term, 1872.

COLE, J.    It appears that the land in controversy is a part of a tract which was known and described in the report of the commissioners to examine titles and claims in the territory of Michigan, under the act of congress of February 21, 1823 (3 U. S. Stats. at Large, p. 724, chap. 10), as the "*vacant strip*" situated between private land claim No. one, confirmed to Jacques Porlier, and private land claim No. two, confirmed to Louis Grignon, on the west side of Fox river at Green Bay. Alexis Gardapier made a claim before the commissioners to a tract lying on the west bank of Fox river, and more particularly described as being a vacant strip lying between a tract number one, confirmed to Jacques Porlier, on the north, and tract number two, confirmed to Louis Grignon, on the south, commencing at low water mark and running west eighty arpens, and in width three arpens on the river.    American State Papers, Public Lands, Vol. 4, p. 722.    This claim was confirmed by the commissioners, providing it did not interfere with any confirmation before made by them (id., p. 723.)    In the act of congress (chap. 28, p. 260, 4 U. S. Stats. at Large) confirming claims purporting to be confirmed by the commissioners or recommended for confirmation, among other things it was enacted, that the secretary of the treasury, under the direction of the president of the United States, be authorized and required, as soon as might be, to adopt such measures as might be necessary to give full effect to the reports of the commissioners enumerated, etc. ; but with the proviso that the confirmations made by the act should not be construed to extend " to any lands occupied by the United States for military purposes."

The defendant claims that this act of congress confirmed Gardapier's title to the entire vacant strip between lots and and two. But it appears that in 1860 congress passed an act for the relief of Pierre Grignon (chap. 125, p. 857, 12 U. S. Stats. at Large), in which is confirmed to him a piece of land lying on the west side of Fox river at Green Bay, immediately below the first creek that empties into said river, being about fifteen acres front on said river and extending back indefinitely. The commissioners had, in their report, confirmed this tract to Pierre Grignon, providing "it shall not interfere with a confirmation heretofore made to Jacques Porlier, or with a confirmation made by this board to Alexis Gardapier." Am. State Papers, *supra*, p. 721. And in 1866 congress passed another act (chap. 2, p. 615, 14 U. S. Stats. at Large), which provided that the claim of Alexis Gardapier to the tract of land described in the report of the commissioners "as lying on the west bank of Fox river, and more particularly known as being a vacant strip lying between a tract number one, confirmed to Jacques Porlier, on the north, and tract number two, confirmed to Louis Grignon, on the south, commencing at low water mark and running west eighty arpens and in width three arpens on the aforesaid river," be confirmed, and the commissioner of the general land office was authorized to cause the said tract to be surveyed in the same manner that other private land claims at Green Bay had been surveyed, and the law directed that a patent should issue therefor.

In pursuance of these acts of congress, the commissioner of the general land office caused a survey to be made of the private land claims of Alexis Gardapier and Pierre Grignon, which, it appears, had not before been surveyed for the reason that they were formerly embraced within "Fort Howard Military Reservation." By this survey the Gardapier tract was set off of the same width on the river as confirmed by the commissioners, and the remainder of the vacant strip was set off for Pierre Grignon, according to the act of 1860 above referred to.

And the land in dispute is a portion of the tract thus assigned to Pierre Grignon.

In view of this legislation by congress, it seems to us to be impossible to support the proposition contended for by the defendant's counsel, that Gardapier acquired title to the entire vacant strip between private claim number one and private claim number two. For, by the act approved April 17, 1828 (chap. 28, *supra*), congress expressly reserved all lands occupied by the United States for military purposes from the operation of that enactment. And that the land described "as vacant strip" was embraced formerly in the Fort Howard military reservation, is a fact, we think, abundantly established by the evidence.

And this brings us to the principal defense set up in the answer, which is, that the defendant and those under whom he claims entered into the possession of the premises in dispute in this action under a claim of title exclusive of any other right, founding such claim upon a written instrument as being a conveyance, and had continued in the possession under such claim adverse to the claim of the plaintiff, for more than forty years before the commencement of the suit.

As this land was reserved by the United States for military purposes until the act of 1860 was passed, the question arises, Can there be any such thing as an adverse possession against the government or its patentee before that time? Upon general principles of law we should say there could not be any such adverse possession; but upon this subject we have a direct adjudication of the supreme court of the United States in the case of *Gibson v. Chouteau et al.*, recently decided. That was an action of ejectment, brought originally in the state court of Missouri, in which the plaintiff claimed to recover on the strength of a patent issued to his immediate grantor. The patent was founded upon a location made by the representative of one O'Carroll under an act of congress of February 17th, 1815, passed for the relief of parties whose lands in the county

of New Madrid had been injured by an earthquake in 1812. The location was made in June, 1818, on behalf of one Wilt, who had succeeded to the interest of O'Carroll. The land had been previously surveyed by a deputy surveyor of the territory; and in 1841 the survey and plat thereof were returned to the recorder, who issued thereon a patent certificate in favor of O'Carroll or his legal representatives. This survey did not meet the approval of the commissioner of the general land office, as it did not show its interferences with conflicting claims; and under his instructions a new survey and plat were made in 1862, upon which the patent issued. Among other defenses, the defendants sought to defeat a recovery upon the ground that the evidence showed that they had been in possession of the demanded premises more than ten years previous to the issue of the patent, which was the period prescribed by the statute of Missouri within which actions for the recovery of real estate must be brought. The defense under the statute of limitations having been sustained by the supreme court of the state, the cause was removed by writ of error to the supreme court of the United States, under the judiciary act of 1789. And the supreme court held that the occupation of lands derived from the United States, before the issue of their patent, for the period prescribed by the statutes of limitation of a state for the commencement of actions for the recovery of real property, is not a bar to an action of ejectment for the possession of such lands founded upon the legal title subsequently conveyed by the patent; that congress has the absolute right of prescribing the times, conditions and mode of disposing of the public domain, without any interference by state legislation; and that this right necessarily prohibits the states, by legislation, from depriving the grantees of the United States of the possession and enjoyment of the property granted by reason of any delay in the transfer of the title after the initiation of proceedings for its acquisition; that the consummation of the title was not a matter which the grantees could control, but one

which rested entirely with the government; that with the legal title, when transferred, goes the right to possess and enjoy the land; and that it would amount to a denial of the power of disposal in congress, if these benefits, which should follow upon the acquisition of that title, could be forfeited because they were not asserted before that title was issued.

This is the reasoning of the supreme court upon this question of adverse possession; and to our mind it is entirely satisfactory and conclusive. The continued occupation and possession of the premises, therefore, by the defendant and those under whom he claims, cannot be held to be adverse to the plaintiff's right derived through the act of congress of 1860 and the patent issued in 1870 in pursuance thereof. Prior to 1860, the title, legal and equitable, was in the United States by reason of the reservation of the land for military purposes.

The defendant offered in evidence and relied upon various tax deeds, under which Elisha Morrow claimed title to the land occupied by the defendant. It is said on the part of the plaintiff, that the lands were not taxable prior to the issue of the patent, and that therefore all tax sales prior to 1870 were void. This position, we think, is untenable. The law of congress of 1860 confirming to Pierre Grignon this parcel of land changed the ownership of the property. The land was no longer a part of the public domain, but became private property and liable to taxation like other real estate. This was expressly ruled in *Witherspoon v. Duncan*, 4 Wallace, 210, in a strictly analogous case. It was there held that the right to tax attaches as well to donation entries as to cash entries, and exists as soon as the ownership is changed in either case by the particular tract being segregated from the mass of public lands and becoming private property. And that the law of congress of 1860 had the effect to confer upon and vest in Pierre Grignon the entire equitable title and ownership of the tract therein described, seems to us quite plain and obvious. The mere naked legal fee remained in the United States until the patent issued, but all the equitable

and beneficial interest was in Pierre Grignon, his heirs, legal representatives or assigns. The land, therefore, became taxable after June 13, 1860. The lands being subject to taxation after this time, the question arises, Were the tax deeds available to prove title in Morrow? And this, of course, depends upon the further question, whether Morrow could acquire a tax title. Upon the facts appearing in the case we think he could not.

On the matters stated in the answer it must be assumed that Morrow was in possession of the lands when the taxes were assessed, claiming to be the owner. For the answer sets up, as before remarked, as a defense, that the defendant and those under whom he claims had been in the continual occupancy and possession, claiming title, for over forty years prior to the commencement of the action. If Morrow was in possession claiming title, we must presume, under the law requiring the officer to assess the lands in the name of the owner or occupant, that the land was assessed to him. It then became his duty to pay the taxes, and he could not permit the lands to be sold for such taxes and obtain a tax deed for the purpose of destroying an outstanding title. *Bassett v. Welch*, 22 Wis., 175; and *Jones v. Davis*, 24 id., 229. And the same principle would prevent him from acquiring and keeping alive a tax title purchased from Curtis. It appeared that Morrow had obtained a release from Curtis of the latter's title, under sections 39 and 40, chap. 22, Laws of 1859. This was nothing more than buying in a tax title by one against whom the taxes were assessed, and who, we may properly assume, was under an obligation to pay them. It was equivalent to, and should have the same legal effect as, a purchase by the real owner of an outstanding tax title.

An objection was taken to these tax deeds that they were all void for want of a sufficient description of the premises. In consequence of the views already expressed, this point becomes immaterial; but perhaps we ought to give some indication of our opinion for the guidance of the circuit court on a new trial, in case the proof should show that Morrow might avail himself

of those tax deeds, the presumption that he was bound to pay the taxes being rebutted by the evidence. And we therefore say that we think the description of the premises in the tax deeds was sufficient. There would probably be no difficulty in ascertaining from the description what premises were conveyed by the deeds.

The court below directed the jury to find for the defendant. What view the court took of the case cannot be determined from the record, further than that the plaintiffs were not entitled to recover. But whether this was because the plaintiffs' title through the various *mesne* conveyances produced in evidence was defective, or whether the tax deeds were held to be valid as against the plaintiff, it is impossible to tell. Possibly the court may have thought the original Gardapier claim included the entire vacant strip between lots one and two, and that it was confirmed to him by the act of April 17, 1828. The court refused to give various special instructions asked on the part of the plaintiff; but under the circumstances we do not feel called upon to notice these propositions *seriatim*. Our general remarks upon the case sufficiently foreshadow our views in respect to some of them.

The judgment must be reversed, and a new trial awarded.

*By the Court.*—So ordered.

The respondent moved for a rehearing. The argument of his counsel in support of that motion is not found upon the files

The following opinion was filed at the June term, 1872.

Cole, J. The arguments on the motion for a rehearing have not changed our views in respect to the questions decided in the former opinion, except upon one point, And that is, we think we were incorrect in holding that the land was subject to taxation after the passage of the act of congress of 1860, and before a survey thereof had been made and approved by the executive department of the government. In the decision

already made, we held that the legal effect of this act was really to vest in Pierre Grignon and his heirs and assigns the ownership of the land, and therefore that the property became subject to taxation from the time this act went into operation. That act does indeed, in terms, ratify and confirm in Pierre Grignon the title to a tract of land lying on the west side of Fox river, immediately below the first creek which empties into that river. About this there can be no question. But the act further provides that the commissioner of the general land office shall cause this tract of land to be surveyed in the same manner as other private claims to land in Green Bay had been surveyed, and that he issue a patent therefor in the name of Pierre Grignon, subject to such legal transfers or assignments as might have been made by him or his heirs or legal representatives at any time subsequent to the confirmation to him by the commissioners, according to the fifth section of the act of 1823.

The counsel for the plaintiffs now insists that until a survey was made under the direction of the commissioner of the land office, which should be approved by the executive department of the government as contemplated by this act, the land confirmed to Pierre Grignon was not separated from the lands owned by others, and that its boundaries could not be ascertained and known so as to render it liable to taxation. It is said that until this survey was made and approved, and the tract located by some ascertained limits, neither Grignon nor his heirs or assigns had any specific land capable of description and taxation under the laws of this state. It seems to us that this view is correct.

The act of congress undoubtedly contemplated that a survey of the land confirmed to Grignon should be made under the direction of the commissioner of the general land office. This was obviously for the purpose of fixing the locality of the tract confirmed to him and his assigns; and until the approved survey was made and a patent therefor issued, it was impossible

to determine the boundaries of the tract of land to which title would attach under the grant.   And this circumstance distinguishes this case from cases where the lands acquired from the United States have been previously surveyed and segregated from the mass of the public lands.   In the latter case possession can be taken of some distinct subdivision, which becomes private property, and therefore justly chargeable with the payment of taxes.   But in the case before us the grant was to be located by a survey made under the direction of the commissioner of the general land office ; and until this approved survey was made, and a certificate as evidence of that fact, or a patent, issued, the title to no specific tract of land passed under the act.   This, we think, is the manifest intent of this act, and we were therefore mistaken in holding that it vested in Pierre Grignon and his assigns the equitable title and ownership of any specific tract of land before such tract had been ascertained and designated by the necessary survey.   The official survey was not made and approved, nor the register's certificate or the patent issued thereon, until 1870 ; and before this we think the land was not liable to taxation.   In this respect the previous opinion is modified.

It is, however, objected by the counsel for the defendant, that if this view is correct, and the title legal and equitable remained in the United States until the passage of the act of 1860, then the plaintiffs acquired no interest in the land by the conveyances introduced in evidence on the trial.   All that we deem it necessary to say in answer to this objection is, that those conveyances transfer whatever interest, claim and demand the heirs of Pierre Grignon had in this claim, and the act of congress expressly declares that the *patent issued shall be subject to such legal transfers or assignments as may have been made by Pierre Grignon, his heirs or legal representatives.*   Under this law it is plain the patent would enure to the benefit of the plaintiffs.

Again it is said there was no sufficient evidence that the pri-

vate land claims of Gardapier and Pierre Grignon were embraced in the military reservation. It seems to us that the evidence is abundant to show that the executive department of the government treated these claims as lying within the reservation, and this is conclusive upon that point, whether these claims were actually occupied by the government troops or not.

The objection that the confirmation to Pierre Grignon was void for uncertainty, is clearly untenable. The act was passed with reference to the report made by the commissioners, and the plats and maps on file in the general land office, by means of which the tract was in fact surveyed and located.

*By the Court.*— The motion for a rehearing is denied.