Perkins vs. Wilkinson.

PERKINS, Respondent, vs. WILKINSON, imp., Appellant.

*November 29 — December 29, 1893.*

*Tax titles: Person bound to pay taxes cannot acquire: Vendor and purchaser of land: Mortgages: Fraud: Bona fide purchaser.*

1. One with whose means land was purchased, and who agreed, as part of the consideration, to pay existing mortgages thereon, and who continued to be the real owner and, through tenants, to be in possession of the land, although for purposes of his own the apparent legal title was at times in different other persons, was, as between himself and the grantor, who besides holding a mortgage for a part

of the purchase price had become the owner of the prior mortgages mentioned, bound to pay the taxes on the land and could not, as against said mortgages, acquire a valid tax title founded on a sale for such taxes.

2. A tax deed so obtained by such real owner for the purpose of cutting off said mortgages is *held* in this case to have been the result of a deliberate fraud; and one to whom he conveyed the land, and who had knowledge of the mortgages and of the relations of his grantor to the premises, and who gave nothing for such conveyance except a release of stale claims against his grantor and his son-in-law (his grantor's son), is *held* not to have been a *bona fide* purchaser.

APPEAL from the Circuit Court for *Pierce* County.

This action was brought by the plaintiff as the owner of three mortgages on the premises described in the complaint, being a farm in Pierce county known as the "Dexter Owen Farm," and upon which mortgages there was due about $5,700, to set aside, as fraudulent and void, a certain tax deed thereof to the defendant Webster, dated August 26, 1890, and a conveyance by him to the defendant *Wilkinson* September 12, 1890; and it was charged that the defendant *Wilkinson* had notice of the fraudulent and illegal character of the tax deed, and was not a *bona fide* purchaser for value.

It appears from the findings, among other things, that the plaintiff and the defendant Webster were formerly the owners of the premises in question, having purchased the same of Dexter Owen April 20, 1883. That August 27, 1883, plaintiff sold his undivided interest to the defendant Webster, said Webster then and there assuming and agreeing to pay the two mortgages then on said premises. That the conveyance of plaintiff's undivided half, at the request of Webster, was made to his son, Frank S., though the consideration was paid by the defendant W. L. Webster, and his son Frank never paid anything toward the purchase and had no interest in the farm; plaintiff taking from said Frank Webster and wife, at the request of W. L. Webster,

a mortgage upon the .farm for $1,750, in part payment.
The mortgages in question were all duly recorded, and re-
main unsatisfied.   The defendant Webster, at the time,
alleged as a reason for making the conveyance to his son,
that there were outstanding claims against him.   The de-
fendant W. L. Webster, as part consideration for the con-
veyance of the plaintiff's interest in said farm, assumed and
agreed to pay the said mortgages then upon it, and the
deed so executed at his request to his son, Frank, contained
a provision whereby the grantee in said deed assumed and
agreed to pay them.   About thirty days afterwards, Sep-
tember 20, 1883, Frank S. conveyed said farm to his mother,
the wife of the said W. L. Webster, and she, on the 11th of
January, 1888, conveyed the same to her brother, and
brother-in-law of W. L. Webster,— E. H. Blodgett.   W. L.
Webster, from the time he so purchased of said plaintiff until
the date of his conveyance to the defendant *Wilkinson*, Sep-
tember 12, 1890, was, through his tenants and otherwise, in
the possession of and exercised full control over the said farm
and premises.   That in the mean time he leased the same
to various tenants in his own name.   That after such sale
said land was assessed to said W. L. Webster, and he paid
the taxes upon the same for several years, but omitted to
pay the taxes of 1886, and, as before stated, obtained a tax
deed of the premises for the taxes of that year, and about
twenty days thereafter made a warranty deed to the de-
fendant *Wilkinson* for a recited consideration of $7,000,
consisting solely of the release of a certain claim *Wilkin-
son* held against Frank S. Webster, who was his son-in-law,—
having married his daughter,— for moneys advanced to the
said Frank a long time prior to said conveyance, and which
were stale claims, though they might have been collectible·
had they been enforced (yet the evidence was satisfactory
to show that the said *Wilkinson* never intended to enforce
them, but regarded them as advances to his son-in-law, the

said Frank S. Webster), and the further consideration of the release of a certain chattel mortgage held by *Wilkinson* against the defendant W. L. Webster, and the notes thereby secured. That said last-mentioned claim had been given in the interest or for the benefic of Frank S., and that the statute of limitations had run against the notes at the time, and they were regarded as worthless by the parties; and the court found that the consideration paid by *Wilkinson* was merely nominal. In the month of July, previous to the execution of the tax deed, the plaintiff inquired of Webster if all the taxes upon the said premises had been paid, and was informed by him that they had been, with the exception of the taxes for the year 1890, which he agreed to pay, and plaintiff relied on such information and made no other inquiry in respect to said taxes. The plaintiff bought up two of the mortgages in question in 1888, and the third was given to him by Frank S. Webster in part payment of the purchase money of his interest in the farm. W. L. Webster and the defendant *Wilkinson* were acquaintances and somewhat intimate; both residing at Red Wing, about five or six miles from the said farm. Webster made repeated and frequent visits to the farm, and his control of it was open and notorious, and *Wilkinson* must have had knowledge of that fact and of the title to the premises; and the court found that he was not a purchaser in good faith; that the conduct of the defendant Webster was instigated by a desire to defraud the plaintiff and deprive him of the benefit of his security.

It was found that the only evidence of posting notices of the tax sale in question to be found in the office of the county clerk for Pierce county, or any other of the county offices, was an affidavit of the county treasurer, in which he states: "That I did make the notices of sale of lands for taxes, of which a true copy is herewith annexed, and did cause true copies thereof to be posted in four public

Perkins vs. Wilkinson.

places in said county more than four weeks prior to the day of such sale of lands for taxes, one of which copies was posted in a conspicuous place in my office in said county." The several forty-acre tracts were stricken off to one Strickland for $8.80 each. Notice of application for a tax deed thereon was given by W. L. Webster, as holder and owner of the tax certificates, to the said E. H. Blodgett, his brother-in-law, to whom the premises had been conveyed as aforesaid, and was served by the said Webster, then in possession and control of said premises through his tenant, one Perkins, and it does not appear that Blodgett was ever the occupant of said premises. Webster was in possession of the farm in 1886. J. D. Coger was carrying it on as his tenant. J. R. Perkins was in possession in 1890 under W. L. Webster. He testified that Webster, in respect to deeding the farm to Blodgett, said: "He wanted to get Coger off the farm, and tried to buy him off; his lease, he said, read he could stay there until he sold, and he said, 'I'll fix him. I will deed the farm to Blodgett. I will get him off, if it costs five hundred dollars.'" The said Perkins has remained in possession of the said premises, as the tenant of said Webster, ever since the date of the tax deed. Further, that there was no evidence to show that Blodgett ever paid anything for the premises, aside from the recital in the deed to him, or to warrant the finding that he ever exercised any control over said premises, or claimed to have any interest therein. That the conveyance from said Webster's wife to him was made at the solicitation and direction of said Webster, who was found to be the real party in interest in said premises ever since the purchase by him of the said plaintiff's undivided half interest. These findings appear to be abundantly sustained by the evidence.

In addition to the findings, the case contains no evidence to show that Frank S. Webster ever claimed any interest in said premises, or exercised any act of ownership over

them or in relation thereto, or that he was ever conscious that the title to said premises had ever been conveyed to him, other than the fact that he conveyed the same to his mother; nor is there any evidence whatever to show that she paid any consideration for such conveyance. The evidence is clear and decisive that during all this time the defendant W. L. Webster was exercising acts of ownership over the premises, leasing the same from time to time, and receiving the rents and profits of the same. Evidence was given to show that the defendant Webster, in June before the tax deed was issued, in conversation with the plaintiff, told him he had had some talk with the defendant *Wilkinson* about helping him to pay the mortgages, and that they went down to *Wilkinson's* store, W. L. Webster saying, "We came in to talk about that farm across the river,— the Dexter Owen farm." *Wilkinson* said that he "had been buying a pretty heavy bill of goods, and had not money to put into it just then, but that the 1st of next month he would be able to help him, and that Frank Webster had been doing well and was going to help pay the mortgages off." That about the 1st of July they went to see *Wilkinson* again, and were told that he had not got the money he expected, but that he thought the 1st of September he would have money, without doubt, to pay it up, and wanted the plaintiff to figure up how much there was on the mortgages that he held, and that he made the figures and brought them to him ( *Wilkinson*). These figures were produced in evidence, showing an amount due of $5,782.28, July 9, 1890. Afterwards, about the 1st of September, they went to see *Wilkinson*, and he said he did not know as he could do anything about it; that he would let them know in a few days. Plaintiff testifies: " I think it was somewhere from the 4th to the 8th of September, 1890, that I first learned they had got a tax deed, and I went to see *Wilkinson*. There was no one with me, but

W. L. Webster was in *Wilkinson's* office.  I went in, and asked Webster what this tax deed meant.  Told him that he told me the taxes were paid.  ' Well,' he said, ' *that was everything he had, and he wanted to save something out of it for Eva,*' that is, Frank's wife," — defendant *Wilkinson's* daughter.  But *Wilkinson* did not say anything about his having a deed.  This was about the 8th or 9th of September.

A Mr. Bell testified to a conversation with Webster in October, 1890, in which he (Webster) stated that the plaintiff had tried to swallow him up, and that he had now got a tax title deed of the place, and he thought he could worry him some.  "He said he guessed now he had him, and if he got it back at all he would not get it back under a year."  Mr. Hoard, another witness, testified that in the fall of 1890 Webster told him he had just obtained this tax title on the land.  "He said he thought he had got *Perkins* now where he could kind of warm it to him.  He said he had kept the thing quiet, and he thought he had got the thing completed now so that it was all right."

The defendant Webster, in testifying in relation to the interview between the plaintiff and himself at *Wilkinson's* store and in his presence, after he had got the tax deed, said that the plaintiff sat down beside him, and very confidentially says: "' Billy, you have got a tax deed on that farm, ain't you?'  Said I, 'I have.'  He said he didn't think I would do that on him, and that was about all there was of it, and went off."  That " *Wilkinson* was at his desk, not near enough to hear the conversation, for the plaintiff was talking kind of low to me.  I think he felt kind of bad, and did not want to talk loud.  I couldn't tell you whether or not he was indignant.  I think, perhaps, he was not.  I don't know as he appeared to feel hurt, but I wouldn't be surprised if he thought it was a pretty mean trick.  I would myself, but it don't make any odds what I thought."

The plaintiff testified that he spoke in a loud tone of voice and in an indignant manner, and that *Wilkinson* was within three or four feet of them. The defendant Webster claimed that his connection with the farm, although he did the trading, was as agent for his son and for his wife, etc.; and it appeared that the plaintiff and Webster had been partners in the livery stable business, and a half interest in the livery stock and premises was traded to Owen by the plaintiff and defendant for the farm. Plaintiff testified that W. L. Webster and himself owned the property together, but it appeared that the title to an undivided half of the lot was in Frank S. Webster, though they never paid him any rent for it.

The defendant *Wilkinson* did not deny the interviews between himself and the plaintiff when he came to see him about the mortgages on the Dexter Owen farm, during the summer of 1890. He said that the plaintiff tried to induce him to buy his claim on that farm. He denied that Webster was with him on either of these occasions. In respect to the claim against W. L. Webster, part of the consideration for the conveyance to him, he said: "It is pretty hard to say what that obligation was worth. I don't know whether or not it was collectible. That is something I can't tell." That the judgment which he had recovered against Frank was discharged, and the notes surrendered up to Webster. That judgment was obtained when he supposed Frank had abandoned his family. "The relations between Webster's family and mine were such that I did not force the matter at all." That he did not pay any money on the purchase. That the mortgage against W. L. Webster had not been renewed, and had ceased to have any force. He did not know where the property was, covered by it, but supposed it had passed out of existence long ago. That Frank Webster was in Montana, and had been there for several years,— four or five. His wife is now living

with him there.   That matters were arranged so his wife returned to him.   "That he did not know whether he would have enforced that judgment, as long as things were harmonious and right.   He could not say.   Could not say that he would never have used it if he had not had a chance to go into this scheme about the farm."

Judgment was rendered, setting aside and canceling the tax deed in question, and the said deed from Webster to the defendant *Wilkinson*, as against plaintiff's mortgages and so far as the plaintiff's rights thereunder were concerned, and declaring the same null and void.   The defendant *Wilkinson* appealed.

The cause was submitted for the appellant on the brief of *J. S. White*, and for the respondent on that of *Albert Combacker*, attorney, and *Clapp & Macartney*, of counsel.

PINNEY, J.   1. It is plain that the defendant Webster occupied such a relation to the lands in question and to the plaintiff, as the owner and holder of the three mortgages thereon, that it became and was his duty to have paid the taxes for which they were sold in 1887 and deeded to him by tax deed in 1890.   The procuring by him of the tax certificates of sale and tax deed thereon operated as a redemption of the lands, as between the plaintiff and Webster, so that as between them the tax deed, as an instrument of title, was void.   Webster was the real beneficial owner of the land for over seven years, with an apparent legal ownership at times in different other persons, evidently to better promote plans and purposes which he may have intended to carry out in respect to third parties.   The farm had been purchased with his means, and it was substantially all he had, as he told the plaintiff.   As landlord he was bound to pay the taxes, though the land was actually occupied by his tenants or croppers under him.   The collector, under his warrant, could enforce payment of the taxes as against

them, and by sec. 1154, S. & B. Ann. Stats., they could re-
cover the amount against him, with twelve per cent. in-
terest, or they might retain the same out of the rents. For
all purposes of taxation, he was in possession, and he was
claiming title to the farm. He had agreed to pay the two
elder mortgages as a part of the consideration for his pur-
chase, and was therefore, as between him and the plaintiff,
who held them, bound to pay the taxes. The cases are
numerous, in this state and elsewhere, in support of the gen-
eral proposition that no one can acquire a valid tax title
founded upon a sale for taxes which it was his duty either
legally or equitably to pay, and enforce it as against any
person who would be prejudiced by his neglect. · Black,
Tax Titles, § 556; *Smith v. Lewis,* 20 Wis. 350; *Avery v.
Judd,* 21 Wis. 264; *Bassett v. Welch,* 22 Wis. 175; *Whitney
v. Gunderson,* 31 Wis. 379; *Fallass v. Pierce,* 30 Wis. 443;
*Newton v. Marshall,* 62 Wis. 8. Webster recognized his
liability to pay these taxes, and falsely and deceitfully rep-
resented to the plaintiff that the taxes in question had been
paid, with the intention of preventing him from making
redemption while yet it was in his power, so that he
(Webster) could work out his scheme to fraudulently cut
off the plaintiff's mortgages. After having succeeded in
thus deluding the plaintiff and obtaining the tax deed, he
twice openly boasted of the ·success of his scheme, and had
the assurance to testify on the stand, in open court, that
he "thought it was a pretty mean trick, but it didn't make
any odds what he thought." It is needless to search fur-
ther for evidence that the tax deed in question was the
result of a deliberate and outrageous fraud.

2. The circuit court very properly held that *Wilkinson*
was not an innocent purchaser. He knew perfectly well
of the existence of these mortgages, and that Webster
claimed to be anxious to pay them. The "intimate rela-
tions between the families" had, no doubt, made him fa-

miliar with the possession and control W. L. Webster exercised over the premises, coupled with his claim of ownership of this large and valuable farm. He makes no denial of these facts. He occupies the novel position of a party who claims to be a *bona fide* purchaser, for $7,000, of this property, under no other claim of title than a tax deed not thirty days old, and which was only *prima facie* evidence of title, and the effect of which might, and most probably could, be readily destroyed. It has been thought that a purchaser from the grantee in such a tax deed could not, as a matter of law, be esteemed a *bona fide* purchaser. *Curtis v. Cisna,* 7 Biss. 260. *Wilkinson,* with the facts before him, was charged with knowledge that the tax deed to Webster was fraudulent in law and in fact, for he could not but understand from these facts that Webster had procured the deed in violation of his manifest duty to have paid the taxes, and for the obvious purpose of cheating the plaintiff out of his mortgage debts. The evidence fairly leaves the case open to the inference that he was only a too willing instrument to enable Webster "to save something for Eva" (*Wilkinson's* daughter) at the expense of the plaintiff's rights, and that the encouragement he held out from time to time to the plaintiff that he might buy his mortgages, until Webster and himself had secured, or had within easy reach, this tax deed, was a part of a concerted plan between him and Webster to defeat the plaintiff's mortgages. He has not parted with anything of material value, or with any claim that the evidence shows that he ever really expected to enforce. With the knowledge of the facts and circumstances which he had, it seems to have been a very reprehensible scheme. He had, at least, knowledge of the plaintiff's rights, and of facts and circumstances showing that the tax deed was fraudulent as against those rights.

The judgment appealed from must be construed in con-

Weld and others vs. The Johnson Mfg. Co.

nection with the pleadings, and it is clear from it that the tax deed and conveyance to *Wilkinson* are canceled and set aside, and are hereafter to have no effect, so far as the plaintiff's rights under his said mortgages are concerned. This is the full scope and effect of the judgment.

This view of the case renders it unnecessary to consider whether the tax deed was void for want of proper proof of posting notices of the tax sale, and requires that the judgment of the circuit court be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.