## WHITNEY and others VS. NELSON.

LAND CLAIMS AT GREEN BAY. (1) *Case followed.* (2) *Act of congress, confirming claim, construed.* (3) *Military reservation; Act of congress construed.* (4) *Uncertain description in original claim*: *Effect of survey and patent.* (5, 6) ESTOPPEL: *By former judgments, and by acceptance of deed, etc.*

1. The decision in *Whitney v. Gunderson*, 31 Wis., 359, followed and approved.

2. There is nothing in the act of congress of April 28, 1828 (4 U. S. Stats. at Large, pp. 260-61), or in the reports of the commissioners appointed to hear and determine claims at Green Bay, which recognizes the claim of Alexis Gardapier (mentioned in said act) as including the *entire* " vacant strip " there referred to, in case the same should be found to exceed three arpents in width on Fox River.

3. An act of congress confirming land claims provides that such confirmations shall not be construed to extend " to any lands occupied by the United States for military purposes." In an action involving the title to such a claim, it appearing that the land claimed was within the limits of a tract "reserved" by the executive government as a military reservation: *Held*, that parol evidence that the officers and soldiers of the garrison situate upon such reservation, did not occupy or use said land for any purpose, was inadmissible.

4. An act of congress, in 1860, declared that the title to a certain tract of land confirmed to P. G. by certain commissioners under a former act, and described as " a parcel of ground lying on the west side of Fox River at Green Bay, immediately below the first creek that empties into said river, about fifteen acres in front on said river, and extending back indefinitely," was thereby ratified and confirmed; and that the commissioner of the general land office should cause said tract to be surveyed in the same manner as other private claims to lands at Green Bay had been surveyed, and should issue a patent thereon, etc. The land was surveyed in conformity with the act, and a patent issued describing the land with reference to the official plat of such survey on file in the general land office, and a copy of which is embraced in the patent. The land patented being thus sufficiently identified: *Held*, that the question whether the original claim or entry of P. G. was " void for uncertainty," is unimportant.

5. A judgment against one of the plaintiffs, in 1869, in foreclosure of a tax deed upon part of the land claimed by her in this action, and also judgments against her ancestor in certain suits for partition and for

specific performance, operated only upon *rights existing at the time such judgments were rendered,* and do not estop said plaintiff from now claiming under a title which accrued subsequently to such judgments.

6. In 1830, D. W. accepted from Alexis Gardapier and wife a deed of the " undivided south half of a certain tract or parcel of land," on the west bank of Fox River in Brown County, " bounded upon the north by lands owned by Jacques Porlier, on the south by lands owned by Louis Grignon, and on the east by the Fox River, containing a front on said river of three arpents, *more or less,* and extending west eighty arpents, and more particularly known and represented as being a vacant strip of land upon the chart or sketch of private land claims at Green Bay, exhibited to the commissioners at Detroit, under the act of congress of April 11 [May 11], 1820." D. W. contracted in writing to convey to one J. W. A. " all the undivided south half of the tract on the west side of Fox River, known as the vacant strip of land on the chart or map of private land claims at Green Bay, which said tract was conveyed to said D. W. by Alexis Gardapier * * by deed," etc. [describing the aforesaid deed]. In 1852 a judgment by default was rendered against D. W., directing a specific performance of said contract by the execution of a deed by him to J. W. A. of the land mentioned in said contract, and by the same description therein contained. Proof was offered that said action arose out of a question between J. W. A. and D. W. as to how much land there was in the "vacant strip"—the former claiming that it included all the land between lots 1 and 2 [viz., the lots of Jacques Porlier and Louis Grignon above mentioned], while the latter had previously tendered him a deed for a breadth of only three arpents. Proof was also offered by the testimony of one E. M., who purchased, about 1862, the title of Alexis Gardapier to the *north* half of the " vacant strip," and under whom defendants claim, that prior to such purchase he examined the record in said suit for specific performance, and the deed executed in compliance with the decree therein, and in making said purchase, relied on the fact appearing from such record and deed, that D. W. recognized the "vacant strip" as including *all* the lands between said lots 1 and 2. *Held,* that this evidence would not *estop* plaintiffs (who claim under D. W.) from asserting that title to said northern half of the " vacant strip " became vested in them under the patent of 1870.

APPEAL from the Circuit Court for *Brown* County.

Ejectment, by *Emmeline S. Whitney,* widow and devisee of Daniel Whitney, *James S. Baker,* and *Louis B. Porlier*; commenced in October, 1870, and tried at the December term,

1873, of said court. The complaint avers that plaintiffs, on the second of June, 1870, were, and ever since have been, seized in fee simple, and entitled to the possession of certain premises, situate in the borough of Fort Howard in said county, particularly described as " bounded on the north by lot. No. 1, confirmed to Jacques Porlier, on the east by Fox River, on the south by vacant strip confirmed to Alexis Gardapier, and west by lot No. 111 of Fort Howard reservation, in town 24, range 20, and containing 94.06 acres ;" and that ever since the day above mentioned, defendant has withheld possession of a certain described portion thereof, recovery of which is here sought.

The answer, in addition to a general denial, sets up an adverse possession by defendant, and those under whom he claims, for forty years, under a claim of title exclusive of any other right, founded upon a written instrument as being a conveyance of the premises.

The land of which the premises here in dispute form a part, and which is described in the words above quoted from the complaint, is the tract for which a patent was issued by the United States to Pierre Grignon and heirs, on the 2d of June, 1870. This patent, and the act of congress (of June 13, 1860) and official survey upon which it purports to be based, together with the deeds and other instruments under which plaintiffs claim that the rights of the patentee have vested in them, are set forth, with sufficient fullness, in the report of another action, brought by these plaintiffs to recover another portion of the same tract ( *Whitney and others v. Gunderson,* 31 Wis., 359–383) ; and they will not be repeated here.

The defendants offered the following evidence :

1. The record of a suit in the circuit court for Brown county, brought by Mary G. Curtis against *Emmeline S. Whitney,* and various other defendants, under the provisions of ch. 22, Laws of 1859, to establish the rights of the plaintiff as grantee in a tax deed based of taxes on 1864, and to bar and foreclose the

rights of the defendants to the land described in said deed. The verified answer of *Mrs. Whitney* in said action, alleged, in substance, that in 1816 the troops of the United States, under the orders of the secretary of war, acting under the authority and direction of the president of the United States, took military possession of the country known as the " Green Bay Settlement," and for an unlimited distance in every direction around it, and established a military post at a place called " Camp Smith," on the east side of Fox River, in said county of Brown, and also, in 1821, or 1822, established another post or garrison, since known as Fort Howard ; that " Camp Smith " continued to be occupied under the order of the secretary of war, either by the troops or by an officer or agent of the United States government, until about the year 1829, when the lands on which the same was erected were patented to John Lawe ; that Fort Howard, and the lands around it, continued to be occupied by the troops, officers or agents of the United States government, until the same was disposed of by the government as hereinafter stated ; that on or about the 2d of March, 1829, the president of the United States, designated as a military reserve all the lands bounded northerly by Green Bay, easterly by Fox River, southerly by private claim No. 2 and westerly by Beaver Dam and Duck Creek ; that between 1829 and 1864, portions of the land embraced in said reserve were granted and conveyed by patent to different persons, but at the time of the assessment for taxes in 1864, a large part of said reserve, including the lands claimed by the plaintiff in said suit, had never been surveyed, sold, granted or conveyed to any person, and remained vacant and unappropriated government lands ; that the heirs of Pierre Grignon, during their lifetime, and their grantees, representatives and assigns, since their decease, had, from time to time, made applications to congress and the officers of the United States government, to have a portion of said lands granted to them under the 5th section of the act of Congress, approved February 21, 1823, but their claim had

never been adjusted, nor had the land claimed been surveyed and patented; that defendant was the owner of said claim; that the title to said vacant and unappropriated lands (embracing the lands claimed in the complaint in that action, and by the heirs, representatives and assigns of Pierre Grignon) was, at the times of the assessment, sale and conveyance, set forth in the complaint, in the government of the United States, and no person had any title or interest therein, subject to taxation by the law of this state, and the assessment, sale and conveyance of the same (if any such ever took place, as alleged), were void. *Mrs. Whitney*, therefore, demanded judgment against the plaintiff in that action, for costs, etc. The issue made by the complaint and *Mrs. Whitney's* answer, was separately tried; and the finding therein was as follows: "I find that the north one-third of the north one-half of private claim known as vacant strip, was sold for the nonpayment of taxes, May 11, 1865; that said land remained unredeemed from said sale; and that May 12, 1868, a deed was executed to the plaintiff, as alleged in the complaint. * * * If the claim recommended for confirmation to Pierre Grignon in 1823, was not taxable before, it became so by ch. 125 of the acts of congress of 1860, notwithstanding no patent may have been issued to Grignon, his heirs or assigns. The land was taxable in 1864; and the plaintiff is entitled to the relief demanded by the complaint." Judgment was accordingly rendered, "that said defendant, *Emmeline S. Whitney*, and all persons claiming, or to claim by, through or under her, after the commencement of this action, be forever barred from all right, title, interest or claim, in and to the land described in the complaint, to-wit: The north one-third of the north one-half of that tract among private claims west side of Fox River, called vacant strip, or any part thereof; that the title to said land be established and quieted in the plaintiff in fee simple," etc. The date of the commencement of said action does not appear in the printed case; but

the finding is dated June 30, 1869, and the judgment July 30, 1869.

The offer of this record was accompanied by an offer of testimony to identify the land in controversy in the present suit as part of the tract described in said record as the north one-third of the north half of vacant strip. The purposes of these offers were stated to be: (1) To show an estate in fee simple in Mary G. Curtis, in the premises here in dispute. (2) To show that *Emmeline S. Whitney* has no interest therein. (3) As containing an admission under oath of *Emmeline S. Whitney*, that these premises were never included within any military reservation. The evidence was rejected.

2. American State Papers, Public Lands, vol. 4, pp. 723 et seq., showing the claim of Alexis Gardapier, the affidavits in support thereof, and the decision of the commissioners in favor of such claim. (See 31 Wis., p. 365.) This evidence was admitted.

3. The act of congress of April 17, 1828, confirming certain land claims at Green Bay. (See 31 Wis., pp. 365–66.) Admitted.

4. A series of quitclaim deeds, conveying to John P. Arndt the title of Alexis Gardapier to the "north half of a tract or parcel of land on the west bank of Fox River, in the county of Brown, more particularly known and represented as being a vacant strip of land on the chart or sketch of private claims at Green Bay, exhibited to the commissioners at Detroit under the act of congress of April 11 [May 11], 1820." (See 31 Wis., 366.) Admitted.

5. A series of quitclaim deeds, by which undivided one-third parts of the land thus conveyed to John P. Arndt were conveyed to various parties;[*] and also the record of a partition

---

[*] Probably the effect of these deeds was to vest in Elisha Morrow (under whom defendant claims) whatever title John P. Arndt had acquired in the middle and north one-third parts of the "vacant strip."—REP.

suit in which a final decree was rendered in 1857. In this suit partition was sought of· " the north half of a certain tract * * on the west side of Fox River in the county of Brown * * , containing a front on said river of three acres, more or less, more particularly known as being a vacant strip of land between lots one and two on the chart of private claims at Green Bay, and being the same tract that was confirmed to Alexis Gardapier by the commissioners under the act of congress of May 11, 1820," etc. The decree divides the land therein mentioned into three parts, described respectively as the north, middle, and south one-third " of the north half of vacant strip in borough of Fort Howard, Brown county, Wisconsin." The map which forms part of the judgment roll, shows that what is here described as the vacant strip includes the whole of the land between Lots Nos. 1 and 2, as their boundaries were then understood, and that the north half of said vacant strip, of which division was made, included the land conveyed by the patent of June 2, 1870, to Pierre Grignon and his heirs. By said decree, the " north one-third " of the land so partitioned was assigned to William Scott, the "middle one-third" to James D. Doty, and the " south one-third " to John W. Arndt, Albert G. Allen and Joseph S. Curtis. This record was " admitted as part of a chain of title — question of boundary not decided."

6. Testimony of John W. Arndt, by which it was proposed to show " that the whole of the land between lots one and two was occupied by those claiming under Alexis Gardapier, during the whole of the year 1828, its boundaries being marked by fences; that the occupation of Gardapier and those claiming under him, within the limits so defined, which include the premises in controversy here, has been actual and continued, without any intermission, under claim of title adverse to every other claim, and continued for forty-four years before the commencement of this suit; and that said lands were not, during any portion of the year 1828, occupied or reserved by the gov-

ernment for military purposes." The evidence was objected to as "incompetent and immaterial, and as tending to show possession adverse to the United States;" and it was ruled out. Defendant then offered to show by the witness, "that the lines of the several private claims on the west side of Fox River were established by the occupants before any survey was ever made by the government, and that, in no instance, except as to the Gardapier tract, which was surveyed in 1869, did the government survey or establish any different line than that previously established by the occupants, the survey simply going so far as to mark out the corners and distances according to the lines already established, the actual location by the occupants not being interfered with in any way by the government; also, that the claim in controversy was never treated by the government as reserved for military purposes." This testimony was rejected on the same grounds above stated.

7. A certified copy of a map of the military reservation at Fort Howard, with the recommendation of its reservation, and the order reserving it, dated March 2, 1829; defendant reserving from his offer the *first* recommendation contained in the margin of said map, except so much thereof as describes the proposed reservation by metes and bounds. The plaintiffs objected that the map and certificates, if received in evidence, must be received *entire;* and the court so ruled, and the same were so received. The map delineates the "Military Reserve" at Green Bay as including the whole of the Gardapier and Pierre Grignon claims. On the margin thereof was a recom· mendation or certificate of "G. A. Macomb, General Commanding the Army," which begins as follows: "The following are the boundaries of the lands which have been occupied by the troops of the U. S. at Fort Howard, Green Bay, and are necessary to be reserved for military purposes." Then follows a description by metes and bounds, which corresponds with the delineation of said "reserve" upon the map. To this is subjoined the following recommendation: "Department

of War, Jan'y 1st, 1829. I respectfully recommend that the lands above described be reserved to the United States for military purposes. P. B. PORTER." Underneath this was written: "Let the lands above described be reserved. J. Q. ADAMS, 2d March, 1829."

The defendant then repeated his previous offers of proof by the witness Arndt, which were again rejected.

8. The record of a suit by John W. Arndt and others against Daniel W. Whitney and others, for the partition of lot 1. This was rejected, and does not seem important here.

9. A deed from Alexis Gardapier and wife to Daniel Whitney, in 1830, of the "undivided south half of a certain tract or parcel of land lying and being on the west bank of Fox River, in the county of Brown, bounded on the north by land owned by Jacques Porlier, on the south by lands owned by Louis Grignon, and on the east by Fox River, containing a front on said river of three arpents, more or less, and extending west eighty arpents, and more particularly known and represented as being a vacant strip of land on the chart or sketch of private land claims at Green Bay, exhibited to the commissioners at Detroit, under the act of congress of April 11 [May 11], 1820;" a written contract of Daniel Whitney to convey to John W. Arndt " All the undivided south half of the tract on the west side of Fox River known as the vacant strip of land on the chart or map of private land claims at Green Bay, which said tract was conveyed to said Daniel Whitney by Alexis Gardapier and Meshakia, his wife, by deed bearing date the 9th day of August, 1830, and in said deed more particularly described, reference being had thereto," etc. ; and the record of a suit in said circuit court by said John W. Arndt against said Daniel Whitney, for a specific performance of said contract, in which Whitney made default, and a decree was rendered against him in October, 1852, directing him to execute to Arndt a deed describing the land as the same is described in the aforesaid deed of Gardapier ; together with

proof, by the testimony of said Arndt, "that the occasion of his bringing the suit was that Whitney had refused to deed him a half of the whole tract between lots 1 and 2, but had tendered him a deed of half a tract only three arpents wide, and that under said decree and the deed executed by Whitney in pursuance thereof, he (said Arndt) took possession of the south half of the whole tract between lots 1 and 2, and he and his grantees had occupied the same and been in undisturbed possession thereof, from the year 1852 to the present time." This evidence was all rejected as irrelevant and immaterial.

10. Testimony of said John W. Arndt to show "that in 1826 the United States authorities in command at Fort Howard, upon demand of the owners of lot 1 and the vacant strip, and of the land in controversy, withdrew from all of these tracts, surrendered the tracts to the occupants, limited the government occupation to lands north of lot 1, and from that time until long after the act of April 17, 1828, went into effect, neither occupied nor claimed a right to occupy the land here in controversy, nor did they treat it as any part of the land necessary or desirable for the use of the military, or for the use of the government for military purposes." Rejected as immaterial and incompetent.

11. The records of two criminal actions in the circuit court for Brown county, in 1826, against Capt. Belknap, one for assault and battery, and one for false imprisonment — the record showing in each case an indictment, trial and conviction, and a sentence to pay a fine of $50; together with the testimony of said John W. Arndt to prove that said Belknap was, at the time of said trials, the officer in command at Fort Howard; that John P. Arndt, the father of the witness, was then running a ferry across Fox River, having its western landing on the vacant strip and on the lands here in controversy; that shortly before the finding of said indictments, Belknap placed a sentinel at said landing, and forbade Arndt to land; that

Arndt, not obeying, was arrested by order of Belknap; that the indictments were found for those acts; and that immediately after his conviction, to wit, in June, 1826, Capt. Belknap withdrew the sentinel, and from that time until long after the passage of the act of April 17, 1828, the United States troops recognized the lands in question as private property, and as not needed by the government for military purposes, nor desired by it for such purposes, and that private persons had perfect right and title to all lands south of the north line of lot 1." "Rejected, as irrelevant and immaterial, and as tending to show possession adverse to the United States.

12. Testimony of said John W. Arndt to prove " that the purchasers of the Gardapier title, in making their purchase, relied upon the acts of the government officers at Fort Howard in abandoning that tract, and acquiescing in the judgments [against Capt. Belknap] above mentioned, which those purchasers understood to decide that the government had no right of possession to this tract of land, and that Gardapier had a legal right to it." In connection with this offer the records and testimony mentioned in the last preceding paragraph were again offered. Rejected, on the ground that it was " intended to estop the government from claiming those lands."

13. Testimony of said John W. Arndt to prove that the government and the troops at Fort Howard never had any other occupancy of the land in controversy than to occasionally cut wood upon it, just as they did upon all land within a circuit of ten miles; and that the tract of land actually occupied by said troops from 1816 until 1850, and upon which they constructed a fort, built barracks and houses, cleared a parade ground, and cultivated gardens and fields, was contained within certain definite boundaries during all that time, which were entirely exclusive of the land in controversy, and a long distance to the north thereof. Rejected as immaterial.

14. Testimony of the same witness to prove "that the commanding officer of the garrison at Fort Howard, at the time the

military reservation was attempted to be made (which was after the passage of the act of April 17, 1828), declared that he did not reserve, or wish to reserve, the lands in controversy for military purposes, but only wanted to keep the whisky sellers off of it, and the intention of the government in making that order, as declared by its executive officers, was not to use the land for military purposes, or reserve it, but to keep the whisky sellers off of it." Rejected as immaterial.

15. Testimony of Elisha Morrow to prove that during the whole of the thirty years, then last past, a tract of land bounded on the north by lot 1, south by lot 2, east by Fox River, and west by a line parallel with that river and eighty arpents distant from it, had been publicly and generally known by the people of Fort Howard and Brown county by the name of 'vacant strip;' that since the partition, evidenced by the record above mentioned, dividing the north half of vacant strip into three parts, the lines of those three parts had been established by survey and definitely marked out, and the parts designated as the north one-third, middle one-third, and south one-third, respectively, of the north half of vacant strip, had been known by these names ever since 1856, and during all the time since then had been assessed for taxation by that description, and the taxes annually collected thereon as so assessed (except in the cases where the lands had been sold for nonpayment of taxes) from the persons under whom defendant claims. With this testimony was offered the record of a *tax deed* from the county of Brown to Joseph S. Curtis, dated September 9, 1865, purporting to convey the north half of the vacant strip, and to be based on a sale in 1862, for a delinquent tax of 1861. Rejected as immaterial.

16. Testimony of the same witness to prove "that he was the same Elisha Morrow to whom the title to the north half of vacant strip had been conveyed from Gardapier by the chain of conveyances previously introduced in evidence (No. 5); that prior to his purchase of that land he examined carefully

the whole history of the vacant strip; that he examined particularly the record in the suit of John W. Arndt against Daniel Whitney, and the deed executed in compliance with the decree in that suit (No. 9), and also the record in the partition suit above described (No. 5); that in making his purchase he relied upon the fact, appearing upon those records, that Daniel Whitney had recognized the vacant strip as including all the lands between lots one and two; and that, believing that the north half of vacant strip was of the same dimensions as the south half, conveyed by Whitney to Arndt, he was induced to make his purchase by a reliance upon the action of Whitney in relation to that suit and deed." This evidence seems to have been rejected.

17. American State Papers, Public Lands, vol. 4, p. 722, containing the original claim of Pierre Grignon and the report of the commissioners recommending its confirmation. (See 31 Wis., p. 365, No. 1.) Rejected as immaterial.

18. Map of the settlement of Green Bay, found in the same volume, between pp. 852, 853. (See 31 Wis., p. 365, No. 3.) Rejected as immaterial.

The plaintiff then put in evidence, 1. A map of the military reservation of Fort Howard. 2. A contract dated May 25, 1868, under which the claims of Alexis Gardapier and Pierre Grignon were surveyed by Fred. S. Ellis, D. S.; the written instructions from the Department of the Interior, in accordance with which such survey was made; and an alleged copy of the map accompanying such instructions; together with the testimony of Mr. Ellis, authenticating the contract and instructions, and the copy of map (the original being lost). For a description of the map see 31 Wis., p. 362, No. 2; for the instructions see same volume, pp. 368, 369.

The court instructed the jury to find for the plaintiffs. Ver dict and judgment acccordingly; and defendant appealed.

*Neville & Tracy,* for appellants:

1. The patent to Pierre Grignon refers to and professes to be

founded upon the act of congress of 1860, confirming to said Grignon " a parcel of ground lying and being on the west side of Fox River, Green Bay, * * * *about* fifteen acres in front on said river, and *extending back indefinitely*." This confirmation refers back to the report of the commissioners appointed under the act of February 21, 1823, and, in its description, follows precisely the words of the original entry by Grignon, recommended for confirmation by the commissioners. This description is *void for uncertainty*. A valid entry must describe the lands so that a surveyor or other competent person can, by such description, or with the aid of other papers, maps or plats *referred to in the entry*, locate the lands. *Perkins v. Ramsey*, 5 Wheat., 269; *McDowell v. Peyton*, 10 id., 454; *Littlepage v. Fowler*, 11 id., 215; *Taylor's Devisee v. Owing*, id., 226. The surveyor general of the U. S. has no authority to locate any claims except in exact conformity to an entry. Act of April 25, 1812, 2 Stats. at Large, 716; 1 id., 466; 1 Brightly's Dig., p. 493, § 207, p. 495, § 213, p. 526, § 381. A patent issued on a void entry is void. 14 How. (U. S.), 377, 389. Nor can the entry be held to have referred to "maps and plats on record in the land office " (31 Wis., 383), because (1) The description refers to no map, plat or record of any kind. (2) There is no proof that any map or plat was ever made. (3) The only allusion to the subject in the case is in the instructions to F. S. Ellis, where it is stated that no map or plat of this claim was ever made. 2. The court erred in rejecting the tax deed to Joseph S. Curtis. The law is well settled that as soon as the equitable title to a piece of land passes out of the government, the land becomes liable to be taxed. It is said in the Gunderson case (31 Wis., 381–2) that the Pierre Grignon tract was not subject to taxation between 1860 and 1870, because, until a survey was made and approved as required by the act of 1860, said tract was not separated from other lands, and "its boundaries could not be ascertained and known so as to render it liable to taxation;" that until such survey was made, etc., "it was im-

possible to determine the boundaries of the tract of land to which title would attach under the grant." But the description in the confirmation to Grignon either *is* uncertain or it *is not.* There either *are,* or *are not,* maps and plats on file in the land office, by which the claim can be located. Either this survey was made in strict compliance with some authority contained in the report of the commissioners, or it was made without authority. In the one case the grant was completely definite; the act of 1860 passed not merely the equitable but the legal title (*Grignon v. Astor,* 2 How. (U. S.), 344; *Challefoux v. Ducharme,* 8 Wis., 287; 12 Peters, 454); and the land was taxable. In the other case the grant was void for uncertainty. In either case the plaintiffs must fail. 3. There is one definite thing in the description of this land claimed by and confirmed to Grignon: the starting point is "immediately below the mouth of the first creek." The land surveyed for and patented to Grignon is very much farther down the stream. There is no warrant for this in the entries or in the law; and the patent is void. The authorities relied upon by plaintiffs' counsel as an answer to this objection, are either cases in which the claimant was authorized to locate a certain quantity of land at any place within a specified district, or cases in which the parties occupied just the situation which the claimants of lands at Green Bay occupied *before* their claims had been examined and decided upon by the commissioners. The case in 13 How., 18, is one of the latter class. 4. As to the statute of limitations. (1) The act of June 13, 1860, confirming the title of Pierre Grignon, requires a patent thereof to be issued in his name, "subject to such legal transfers and assignments" as may have been made by him, his heirs or legal representatives, at any time subsequent to the confirmation made to him by the commissioners under the act of 1823. Whitney claimed under quitclaim deeds, most of them given between 1830 and 1832. This court, in *Whitney v. Gunderson,* held these to be such transfers as the act contemplated, and that the operation of the act was to vest the

title in Whitney. But the *statute of limitations* has all the effect of a quitclaim deed; it is a "legal transfer," one made by operation of law; it does not merely bar the remedy, but transfers the title. *School District v. Benson*, 31 Me., 384–5; *Hughes v. Graves*, 39 Vt., 365; *Knox v. Cleveland*, 13 Wis., 245–49. Any claim capable of transfer by quitclaim deed, is also capable of transfer by the operation of the statute of limitations. (2) The act of congress of June 2, 1862 (12 Stats. at Large, 410), provides that "nothing in the law requiring executive officers to survey land claimed or granted under any law of the United States shall be construed either to authorize such officers to pass upon the validity of the titles granted by or under such laws, or to give any greater effect to the survey made by them than to make such survey *prima facie* evidence of the true location of the lands claimed or granted, nor shall any grant be deemed incomplete for want of a survey or patent, when the land granted can be ascertained without a survey or patent." (And see 10 Stats. at Large, 599.) That is, in cases where a specific piece of land is granted, the grant is complete without survey or patent; in cases where a specific *quantity* of land is granted with a right to the donee to select them, have them surveyed, etc., no title to any specific tract can pass until after selection, survey, etc.. Pierre Grignon's claim, and the confirmation thereof, were not of the latter kind. If the act of June 13, 1860, so far as it related to him, was valid at all, it granted or confirmed to him a specific tract of land; and the title thereto vested in him by virtue of the act, without any survey or patent. But we pleaded and offered to show an adverse possession for over ten years, after the passage of that act and before the commencement of this suit, which possession was founded upon written instruments purporting to be conveyances of the land. Why was not this a good bar to plaintiffs' action? 5. Title to this land passed out of the United States by the act of April 17, 1828, unless it was then either *reserved* or *occupied* by the

Whitney and others vs. Nelson.

United States for military purposes. The proof admitted shows that the order of *reservation* was not made until March 2, 1829 ; and evidence was offered, and improperly rejected, to show that there was never any occupation of this land for military purposes. Subsequent legislation by congress cannot affect the question, or the proof of those facts. 6. The act of 1860 merely ratifies and confirms the title "confirmed to Pierre Grignon by the commissioners," etc. The commissioners recommend the claim of Pierre Grignon for confirmation "*provided* it does not interfere with a confirmation made to Jacques Porlier, or with a confirmation made by this board to Alexis Gardapier." The Grignon claim, then, must not conflict with the Gardapier claim. But the latter is described as "a certain tract of land lying on the west bank of Fox river, and *more particularly known* as being *a vacant strip of land* lying between a tract No. 1, confirmed to Jacques Porlier, on the north, and a tract No. 2, confirmed to Louis Grignon, on the south, *    * running west eighty arpents, and in width three arpents on the river." It is "particularly known as vacant strip." But the commissioners designated *all* the land between lots 1 and 2 as "vacant land." The northern and southern boundaries are clearly designated ; it is between lot 1 on the north and lot 2 on the south. There could be no doubt of the true effect of this description, were it not for the words "in width three arpents on said river ;" and as to these the rule is that metes and bounds *always* control distances in a deed. *Jackson v. Barringer*, 15 Johns., 481 ; *Doe v. Thompson*, 5 Cow., 371 ; *Jackson v. Frost*, id., 346 ; *Jackson v. Ives*, 9 id., 661 ; *Wendell v. Jackson*, 8 Wend., 183 ; *Smith v. McAllister*, 14 Barb., 434. 7. The judgment in the suit of Mary G. Curtis against *Mrs. Whitney* and others, to foreclose a tax deed, was dated July 30, 1869 (*after* the survey which established the lines of this claim) ; and it bars the title asserted by *Mrs. Whitney* in this action. Secs. 35, 37, 38, 41–44, ch. 22, Laws of 1859 ; 1 Tay. Stats., pp. 448–451, §§ 199, 201, 202, 205–208 ; Freeman on Judgments,

p. 267, § 299, p. 269, § 303, p. 292, § 329. The judgment is conclusive upon every right and title which the parties *might* have asserted ; and it does not become less final because the losing party afterward receives another and *more formal evidence of title.* Freeman, *supra; Reed v. Caldewood,* 32 Cal., 109 ; *Ryers v. Neal,* Supreme Ct. of Cal., Jan. Term, 1872. 8. The court erred in rejecting the evidence offered by defendant to show an *estoppel* as against *Mrs. Whitney.* See Nos. 1 and 9, *supra.* 9. The deed of two of the eight heirs of Pierre Grignon conveys only land of which Pierre " died seized and possessed ;" and there is no pretense that he died seized and possessed of these lands. 10. The quitclaim deeds from the heirs of Pierre Grignon to Daniel Whitney and *James S. Baker* could not convey any subsequent title. *Jackson v. Wright,* 14 Johns., 193 ; *Jackson v. Hubble,* 1 Cow., 613 ; *Sparrow v. Kingman,* 1 Coms., 242–258 ; *Van Renssellaer v. Kearney,* 11 How. (U. S.), 297, 322. The act of 1860, confirming subject to all legal transfers theretofore made, does not purport to give any more than their strict legal effect to such instruments as may have been executed.

*M. L. Martin* and *C. E. Vroman,* for respondents, relied upon the decision in *Whitney v. Gunderson,* 31 Wis., 359–383, and the authorities cited for the plaintiffs in that case. As to the effect of the judgment in favor of Mary G. Curtis and against *Mrs. Whitney* (No. 1), they argued that *Mrs. Whitney* had no title to any distinct tract of land until the issue of the patent, June 2, 1870, and the judgment did not preclude her from setting up a title subsequently acquired. 4 Wal., 399. A decree which purports to devest the legal title from one in whom it is not vested, can have no effect on the title. 7 Peters, 554. They also argued that it was in the power of the president to determine the extent of the lands occupied under his orders for military purposes, and parol proof was not admissible to show that they were not so occupied ; that this power was expressly conferred upon the president by the act of April

17, 1828 ; and that his discretion in· determining what lands should be reserved, and what lands patented to individuals, was unlimited. 4 U. S. Stats. at Large, 260 ; Report of Committee, 4 Am. State Papers, 697. The action of the executive department of the government in the location, survey, and granting of patents for private claims, is conclusive in a court of law. 16 How., 28 ; 24 id., 184 ; 1 McCall, 401.

COLE, J. A number of the material questions arising in this case and discussed upon the argument, were considered and passed upon in *Whitney et al. v. Gunderson*, 31 Wis., 359 ; and we therefore do not deem it necessary to make any further reference to them than to say that subsequent examination and reflection have only confirmed us in the opinion there announced. Perhaps we should add that it seems to us entirely inadmissible to hold that the act of confirmation of April 28, 1828 (4 U. S. Stats. at Large, pp. 260–61) confirmed in Alexis Gardapier the *whole vacant strip* between the claim of Jacques Porlier on the north and the claim of Louis Grignon on the south, in view of the reservation in the act itself of all lands occupied by the United States for military purposes, and more especially when we consider the report of the commissioners, which manifestly intended to limit Gardapier's claim to three arpents on Fox River, and recommended for confirmation the claim of Pierre Grignon, which could only be satisfied out of a portion of that strip, providing any remained unappropriated after giving Gardapier his land, according to the specified limits. There is certainly nothing in the acts of the commissioners, nor in the legislation of congress, which warrants the conclusion that the claim of Gardapier was recognized as extending to the entire vacant strip, if it should be found that such strip in fact extended three arpents wide on Fox River ; but quite the contrary inference must be made.

So, also, it seems to us it would be equally incorrect and inadmissible, in view of what appears in this record, to permit

the defendant to show by parol testimony that the land in controversy was not actually occupied by the government of the United States for military purposes. That it was reserved for the use of the government is a fact fully established by the evidence.

Again, it was insisted that the entry of Pierre Grignon is void for uncertainty. The patent, however, describes the claim, and, for a more particular identification of its boundaries, refers to the official plat of survey of the same on file in the general land office, a copy of which plat is embraced in the patent. And it will be borne in mind that this survey was made under the act of June 13, 1860 (12 U. S. Stats. at Large, p. 857), which expressly authorized the commissioner of the general land office to cause the said tract of land to be surveyed in the same manner as other private claims to lands in Green Bay had been surveyed. It was assumed on the argument, by the counsel for the defendant, that this survey, which the commissioner of the general land office caused to be made, was wholly without authority of law. But this is a mistake. A survey of the claim was made in exact conformity to the act of congress; and when such survey was made and approved, then the title to the specific tract of land granted, passed to the donee. There surely can be no difficulty in identifying the tract of land included in the patent, whatever might be said of the original claim made by Pierre Grignon before the commissioners.

These remarks are all we deem it necessary to make — after what is said in *Whitney v. Gunderson, supra* — until we come to consider some points relied upon to defeat the title of the plaintiff *Whitney.*

And first, it is insisted that she is estopped from claiming title to the premises, by the judgment in the circuit court of Brown county, at the suit of Mary G. Curtis against her, upon the foreclosure of a tax deed. That suit was commenced and judgment therein rendered in the summer of 1869, before the

patent was issued under which she now claims. And the question is, What effect can that judgment have upon the title which she subsequently acquired? And we suppose that the answer must be, that the judgment in that suit could only operate upon rights existing at the time of its rendition, and that it cannot possibly bar or prejudice any right or interest which had not then accrued. The law upon this subject is very clearly stated in one of the authorities cited on the brief of the counsel for the defendant, as follows : " From the rule that an adjudication affects no claims which the parties had no opportunity to litigate, it results that no judgment or decree can prejudice rights which had not accrued to either of the parties at the time of its rendition. A decision that a right exists, or that a wrongful act has been committed, leaves the parties at liberty to show, at a future time, that since the decision was pronounced, the right has expired, or the wrong has been abated. Intervening events affecting the issue may be shown, to prevent a former judgment from being conclusive, even where the title has been tried in a writ of entry. * * * * Under no circumstances will a judgment or decree take effect upon rights not then existing. If a decree be entered quieting title, and enjoining the defendant from making any further contest against the plaintiff's title, this general language will be confined to rights in issue, and will not prevent the plaintiff from asserting a subsequently acquired title." Freeman on Judgments, § 329. See Bigelow on Estoppel, p. 121 ; *McKissick v. McKissick*, 6 Humph., 71 ; *McCurry v. Robinson*, 23 Georgia, 321 ; *Reed et al. v. Calderwood*, 32 Cal., 109 ; *Mahoney v. Van Winkle*, 33 id., 448.

Now it would seem to be very plain, upon principle, that the rights which the plaintiff *Emmeline S. Whitney* now claims under the patent issued in June, 1870, could not be barred or in any way affected by a proceeding to foreclose a tax deed in 1869. Besides, we have held that until a survey was made under the direction of the commissioner of the land

office, which should be approved by the executive department of the government, as contemplated by the law of congress of 1860, the land confirmed to Pierre Grignon was not separated from the lands owned by others, so that a title to any distinct tract would pass under that act. *Whitney v. Gunderson, supra.* And from the nature of the case it is apparent that the rights which *Emmeline S. Whitney* now asserts could not have been litigated and determined in the suit to foreclose the tax title, nor could they have been divested by the judgment rendered therein.

Again, as it seems to us, there is much less reason for holding that the record either in the partition suit or in the suit for a specific performance of a contract could operate as an estoppel. Upon what principle the proceedings in either of those suits could possibly affect an after-acquired title, it is difficult to understand. Nor can we see that the record in the case for a specific performance was rendered competent testimony by the offer which accompanied it, in which it was proposed to show by Elisha Morrow, that before buying he investigated the state of the title to the vacant strip, and the conduct of Whitney in the action of Arndt against him, and bought relying upon these facts, and believing that the north half was of the same size as the south half sold to Arndt by Whitney, and occupied by the former since 1852. It would be an unwarrantable extension of the doctrine of estoppel to hold that the plaintiff *Whitney* is concluded by any of these matters from now asserting her title under the patent.

These observations dispose of all the material questions arising in the case, not considered and decided in *Whitney v. Gunderson.*

It follows that the judgment of the circuit court must be affirmed.

*By the Court.* — Judgment affirmed.