WILLIAMSON *v.* RUSSELL *et al.*

Decided November 19, 1881.

*(PATTON, JUDGE, ABSENT).

1. A person in possession of real estate as owner may obtain an injunction to restrain others from dispossessing him by means of a writ of *habere facias possessionem* issued by a chancery court without any notice to him in a suit, in which he was no party, where he does not claim the land under any party to the suit but by a title paramount and adverse to them.

*Cause submitted before JUDGE P. took his seat.

2. When land is sold by the order of a chancery court, and the sale is confirmed, and the land is in the possession of a person, who is not a party to the suit, the court should issue a rule against the person to show cause, why he should not surrender possession of the land before issuing an *habere facias possesssionem* directing the sheriff to put the purchaser in possession.

3. But if the court should issue such writ requiring the sheriff to remove such person from the land and put the purchaser in possession without having issued such rule, the sheriff would not be liable to be mulcted in damages for executing such writ.

4. A purchase at a sale of land for delinquent taxes made by one, whose duty was to have paid the taxes, operates only as a payment of the taxes; and the purchaser can acquire no rights as against the owner of the land by the neglect of his duty to the owner.

5. Therefore a tenant, who is under obligation to his landlord to pay the taxes on the land he rents, is disqualified from being the purchaser of this land at a sale for the taxes delinquent by the neglect of the tenant to pay them.

6. *Quœre:*   What is the true construction of these words in the 25th section of chapter 117 of Acts of 1872-3, page 321 : "and the irregularity be such as materially to prejudice the rights of the owner, whose real estate is sold, and it be clearly proven to the court or jury, that such diligence has been exercised by the party, in whose name it was sold, that but for such irregularity the said party would have redeemed the same under the provisions of the 15th and 16th sections of this chapter ? "

7. A married woman having a separate estate in land sold for delinquent taxes with reference to the redemption of the same is not under such disability, as would extend the time, in which she must redeem under the 30th section of chapter 117 of Acts of 1872-3, page 324.

8. The assignment of a mortgage to a married woman since April 1, 1869, though it does not state, that it is for her separate use, creates in her a separate estate in such mortgage under the 3d section of chapter 66 of the Code of West Virginia.

Appeal from and *supersedeas* to an order of the circuit court of the county of Tyler pronounced on the 4th day of April, 1879, in a cause in said court then pending, wherein Theodore A. Williamson was plaintiff, and Joshua Russell and others were defendants, allowed upon the petition of said Williamson.

Hon. James M. Jackson, judge of the fifth judicial circuit, made the order appealed from.

GREEN, JUDGE, furnishes the following statement of the case :

In 1868 Elbert H. Williamson owned a tract of land of forty-four acres on the Ohio river in Tyler county, and conveyed one acre of it to Joshua Russell and all the residue of the tract, forty-three acres, to his brother W. W. Williamson, who at the same time gave him a mortgage on it for $617.38, the balance of the purchase-money due. He assigned this debt and mortgage afterwards to John R. Paw, who on September 23, 1875, assigned it to Louisa E. Walker in consideration of a parcel of land, in which she had a separate estate, and which she conveyed to Paw's wife. Mrs. Walker was then a married woman living with her husband, with whom she continued to live till his death in 1876. Three acres of this tract of land of forty-three acres were mortgaged by W. W. Williamson in 1871 to W. S. Caldwell. He became a bankrupt; and William H. Richardson was his assignee. On December 8, 1875, Mrs. Louisa E. Walker suing as though she was a *feme sole* brought a suit in the county court of Tyler county to foreclose her mortgage on this forty-three acres of land, making all the above named persons other than Russell defendants. At the February term, 1876, a decree was rendered to sell this land. It was sold by commissioners, and Joshua Russell became the purchaser, and the sale was confirmed at the August term, 1876, and by order of the court a deed was made to him by the commissioners in December, 1876.

In October, 1876, the court reciting, that it appears to the court, that Theodore A. Williamson, the tenant of W. W. Williamson, refused to surrender to the purchaser, Joshua A. Russell, possession of this tract of forty-three acres of land, on the plaintiff's motion decreed, that permission be granted the plaintiff to sue out a writ of *habere facias possessionem* directed to the sheriff of Tyler county, commanding him to put the purchaser, Joshua A. Russell, in possession of said tract of land. Thereupon Theodore A. Williamson, who was not a party to said suit, filed his bill in the present cause making all the above persons as well as Joshua A. Russell, and the sheriff of Tyler county, defendants.

In this bill he set forth all the above facts; and that said tract of land had before the institution of said suit been entered on the commissioners' books of Tyler county in the year 1874 in the

name of Wm. W. Williamson, the owner, and W. S. Caldwell the mortgagor of the three acres, a part thereof, and in their names was returned delinquent for the taxes of 1874 ; and in October, 1875, the sheriff sold this tract of land for these delinquent taxes, and he, Theodore W. Williamson, became the purchaser for $12.89, the amount of taxes due. He procured a plat and survey of the land to be made; and the land not having been redeemed within one year, on November 9, 1876, the clerk of the county court made him a tax-deed for said tract of land in conformity to law. The bill also alleges, that he was in possession of this tract of land, and if the sheriff should be permitted to execute said writ of *habere facias possessionem* and put said Joshua A. Russell in possession of said land, incalculable injury would be inflicted on him, the plaintiff. The prayer is, that all the parties defendants be enjoined and inhibited from executing and enforcing said writ of *habere facias possessionem* against the plaintiff and for general relief. The bill was sworn to by the plaintiff. The injunction prayed for was awarded on bond and security being given in the penalty of $200.00.

The bill was taken for confessed as to all the defendants except Joshua Russell, who answered. All the facts stated in the bill are admitted to be true; but the answer alleges these additional facts: that at the time of the forfeiture of this tract of land for the non-payment of taxes and of the sale thereof, the plaintiff, Theodore W. Williamson, was the tenant of William W. Williamson, and that he was the agent of William W. Williamson in the years 1874 and 1875 for the payment of the taxes on this land, and that Louisa E. Walker, the mortgagee and plaintiff in the former suit, tendered within one day after the expiration of the year allowed for redemption the taxes &c. on this land to the plaintiff, which he refused to receive.

There were many arguments set forth in this answer. It was sworn to. A special replication and a supplemental replication were filed, also very argumentative ; but all the facts stated in the answer were during the progress of the case admitted excepting only the fact, that the plaintiff, Theodore A. Williamson, was the tenant or agent of William W. Williamson, which was denied by the replications. Upon these disputed questions of fact the evidence in the case was conflicting.

It was satisfactorily proven, that William W. Williamson had been for many years a non-resident, a resident of Pittsburgh, Pennsylvania; that he owned two tracts of land in Tyler county, West Virginia, one a tract of one hundred and seventy-nine acres, which for years he rented to the plaintiff, Theodore A. Williamson, his brother, the other this tract of forty-five or forty-six acres in controversy, which he rented to another brother, Henry R. Williamson; that the last tract was an improved farm on the Ohio river, on which there was an old dwelling-house, and this land was good land, worth about $25.00 per acre; that Henry R. Williamson, to whom it had been rented, was an indifferent tenant and took little care of the farm, and on March 29, 1874, William W. Williamson wrote to his counsel the following letter:

"ALLEGHENY CITY, PA., March the 29th, 1874.

" A. D. SOPER:

" *Dear Sir:*—I rented that place that Henry lives on to Theodore and I sent a *ritten* notice to Henry in December by Theodore notifying him to give up possession to Theodore the first of April, as I had rented it to him for this year. Now he objects giving Theodore possession; he *as* burnt the rails on the place, and let the cattle in the orchard to destroy it. His wife says she will not give up possession to spite me. I wish you would see Henry and get him to give up possession; if not, compel him by law to give possession to Theodore. Times *is* so hard, that I can not raise that money for Mr. Roberts. I owe Elbert about nine hundred dollars. If you can sell that forty-three acres of land, to lift Elbert's mortgage and pay Mr. Roberts, I will be obliged to you and pay you for your trouble. I think you will have no trouble in getting twelve hundred for it anyhow. Henry told Theodore that he was not lawfully notified and he guessed he would stay. Theodore will show you the letter, then you will know if it is lawful.

"Yours with respect,

" W. W. WILLIAMSON."

This letter was shown to Henry R. Williamson either by A. D. Soper or by the plaintiff, Theodore A. Williamson, and in a few days afterwards, not later than the middle of April, 1874, he moved off from this farm and gave possession of it to

the plaintiff, Theodore A. Williamson, who proceeded to repair the dwelling-house and to build a new fence some fifty yards in length, his brother William W. Williamson furnishing the material and he doing the work. The defendant, Russell, did not prove the terms of contract between William W. Williamson and his brother Theodore A. Williamson, under which he took possession of this tract of forty-three acres as his tenant. He endeavored however to prove the admissions of Theodore Williamson, that by it he was bound to pay the taxes on this tract of land. The proof on this subject, which he offered, was first the deposition of Minor, who testified, that he owed the plaintiff Theodore Williamson some money, and the plaintiff wanted it, and told him he had the taxes to pay on this tract of land, and in this conversation he said : " He guessed he would let the place go to sale and buy it in." Taylor testified, that in the fall or winter of 1875 he was standing in front of this house on this tract of land, when the plaintiff Theodore A. Williamson told him, that the sheriff had promised to wait on him for his taxes (he did not say what taxes), but he was now hurrying him up to pay the taxes, and he said : " He guessed he would let this place go to sale and buy it in."

On the other hand the plaintiff by his own deposition proves, that he never rented this forty-three acres of land of his brother, William W. Williamson, but was simply permitted to occupy it as a tenant at will, and that he was in no manner expected by his brother to pay the taxes on this forty-three acres of land. William W. Williamson testified to *this same state of facts.* But their evidence is in many respects conflicting, improbable and unsatisfactory. For instance William W. Williamson says, that his brother Henry R. Williamson did not rent this forty-three acres of land of him during the years 1871, 1872 or 1873, that he was merely living on it during those years by his permission. Yet it is evident from his letter to A. D. Soper, that Henry had rented this land of him and was therefore entitled to notice to quit. He does not attempt to explain this apparent contradiction between his statement and letter. It seems improbable, too, that he paid no rent for this farm, as the letter on its face shows, that William W. Williamson was in no condition pe-

cuniarily to permit him to live on it for years without paying rent. He says too he did not rent this forty-three acres to Theodore A. Williamson. In this he is expressly contradicted by this letter. This he attempted to explain by saying he wrote, that he had rented it to Theodore A. Williamson, because he thought, that if Henry supposed he had rented it to his brother, he would surrender with less trouble. This seems to me a poor explanation, as I do not see how it would probably have led to a more ready surrender of it, as his brother was at the same time renting the adjoining farm, on which he was living and could have continued to live. William W. Williamson also testified, that he did not know, that Theodore A. Williamson was living on this forty-three acres till some months after he went there to live, that is, till the fall of 1874, when he told him, and he then told Theodore that he intended to start a henery upon it. Before this letter of his to Soper was produced, he admitted, that he had written to him, that he wanted Henry put off, as he wanted this place for himself; but he said, that he said nothing in it about Theodore taking possession of it when Henry left. This is expressly contradicted by the letter, which shows, that he had no intention himself of residing on this place.

Theodore A. Williamson states, that he went on this place, the tract of forty-three acres, in 1874, at the request of his brother, William W. Williamson, to repair the house and fencing. In this he is contradicted by William W. Williamson in his testimony, who says he did not even know, that he had gone there, for eight months after he was living on the place. He says, what he told Taylor was, that he would raise the money to pay the taxes on the tract of one hundred and fifty-nine acres. But this does not consist with another statement he makes, that his brother had sent him the money to pay the taxes on this tract of one hundred and fifty-nine acres. He denies making this statement to Minor. He states, that in 1874 his brother, William, owed him in addition to the repairs he did on this tract of forty-three acres, which he did not rent, also from $40.00 to $50.00; but this is expressly denied by William W. Williamson in his deposition. He says, that in February, 1874, his brother William employed him or got him to go on this farm; he refused to rent it to any one;

but he wanted him to tell Henry it had been rented to the witness, the plaintiff; but he refused to tell him what was not the truth. He does not, he says, know who got Henry to move off from the land. He admits he moved on it in a few days afterwards.

After the letter to Soper was produced, William W. Williamson's deposition was taken again to give him an opportunity of explaining it, which he attempted to do in the manner before stated. He says, Theodore was anxious to rent this place and wrote him a number of letters, but he always refused, because, he says, he wanted to move on it himself. None of these letters were produced. He says too, that he received a letter from Theodore saying this land would be sold for taxes, and he wrote him word, that he had no money to pay the taxes, and it would have to be sold. But neither of these important letters is produced by either party, nor is their non-production explained ; and it seems in the highest degree improbable, that William W. Williamson deliberately permitted a tract of land, that cost him $1,000.00 to be sold for $12.50, and that, too, as he says, while he was permitting his brother to occupy it without any charge for rent. He denies, that he ever authorized Theodore to move on the land for the purpose of repairing the house, as Theodore testified. He admits, that he did send a written notice to Henry by his brother Theodore to quit this land.

I have stated substantially all the evidence on this contested question of fact in this case ; and my conclusion is, that the testimony of William W. Williamson and the plaintiff Theodore A. Williamson is entitled to very little consideration ; and that the fact is satisfactorily established by the evidence, that in April, 1874, this forty-three acres of land was rented by Theodore A. Williamson, the plaintiff, of his brother, and that it was understood between them, that the plaintiff was to pay the taxes on this land ; that he either neglected or purposely refused to do so, and when the land was sold for taxes, he bought it in for $12.50; and that his brother William W. Williamson having probably become insolvent is now content, that he should have this land for $12.50 at the expense of the purchaser of it, Joshua Russell, or of his, W. W. Williamson's, creditors.

The court on motion by an order in vacation dated April 4, 1879, dissolved the injunction awarded in this cause, and at the succeeding term on the 23d day of May, 1879, on the last day of the term, it dismissed the bill and rendered a decree, that the defendants recover of the plaintiff their costs. From this decree an appeal and *supersedeas* have been awarded by a judge of this court.

*T. I. Stealey,* for appellant cited the following authorities: 2 Story Eq. Juris. § 928 note 2 ; Freeman Void Jud. Sales 19 ; High Inj. 149, 150 § 259; *Id.* 94; *Id.* 68 § 106 ; 2 Rob (old) Pr. 388 ; 2 H. & M. 8; 2 Dan. Pr. & Pl. 986 note 1 ; 1 Gratt. 4; Acts 1872-3 ch. 117 §§ 15–25 ; 5 W. Va. 432; Kerr Fraud & Mis. 43, 44; 28 Ill. 81; 1 Warring ch. 172 ; Schouler Dom. Rel. 189; *Id.* 202; Tuck. Com. book 1, ch. 9, pp. 111–117 ; 5 Gratt. 345, 374, 414 ; 6 Gratt. 424 ; 8 Gratt. 148, 332, 486; 11 Gratt. 552 ; Code ch. 66 §§ 1, 2, 3, 12 ; 27 N. Y. 279 ; 34 N. Y. 296; 4 Kent Com. 159, 160; Schouler Dom. Rel. 114, 115, 116, 117, 118; 2 Kent Com. 135, 138; Taylor Land. & Ten. p. 259 § 341 ; Blackw. Tax Tit. 401, 446 note 1.

*Henry M. Russell* for appellee cited the following authorities : 7 W. Va. 329 ; *Id.* 223; 10 W. Va. 250 ; 4 W. Va. 597; *Id.* 186; High Inj. §§ 152, 259 ; 28 Ill. 81 ; 2 W. Va. 491 ; 5 Wall. 74; 97 Mass 105 ; 7 Rob. Pr. 403 ; Taylor Land. & Ten. § 705; 10 Gratt. 415 ; 23 Gratt. 361 ; 17 Ark. 546 ; 42 Me. 244; Acts 1875 ch. 55 § 11; 19 Gratt. 103 ; 27 Miss. 675 ; 20 Wis. 359 ; 9 W. Va. 669 ; *Id.* 664.

GREEN, JUDGE, announced the opinion of the Court:

The first enquiry is, whether a court of chancery has any jurisdiction in a case of this character, and whether the circuit court ought not to have declined to interpose and ought not to have left the plaintiff to seek his redress in a common law court. The facts, so far as they affect this jurisdictional question, are simply these : The county court in a suit in chancery, in which the plaintiff in this cause was not a party, ordered the sale of the land of William W. Williamson to satisfy a lien upon it; the sale was made, and Russell purchased the land, and the sale was confirmed ; the plaintiff in

this suit, Theodore A. Williamson, was in possession of this land claiming by a title paramount, as he alleged, and not under William W. Williamson. The county court reciting in its decree, that he was a tenant of William W. Williamson, and refused to surrender the land to the purchaser, Russell, ordered, that a writ of *habere facias possessionem* should be issued directed to the sheriff requiring him to turn out the plaintiff in this suit, Theodore A. Williamson, and place the purchaser, Russell, in possession. This writ was ordered to be issued without any previous rule to show cause, why he should not be required to deliver up possession of this land, being served on Theodore A. Williamson. This writ went into the hands of the sheriff.

The first question to be decided by us is, whether on this state of facts the plaintiff had a right to ask the circuit court to enjoin the sheriff and others from executing this writ, or should the plaintiff have been left to resort to his common law remedies for the injury he would sustain by the execution of this writ? It seems to me, that this presents a proper case for the interposition of the chancery court by injunction. If the plaintiff in this cause had been dispossessed in this improper manner of his land, his only common law remedy would have been an action of ejectment against Russell, and the burden would have been on him in such a suit to establish his title not only against Russell but against the whole world, whereas if he had been left in possession of the land, Russell would have had to bring his action of ejectment against him, and not only prove, that the plaintiff's title was invalid, but that his, Russell's, title was valid.

This unlawful ejecting of one from his home is very different from a simple trespass on one's land and is in the eye of the law an irreparable injury. It is suggested however, that the plaintiff would have in such case an adequate remedy at law by a suit for damages against the sheriff. But in the case put the plaintiff could sustain no suit for damages against the sheriff. For though the decree rendered by the court might be invalid, because the claimant of the land was no party to the suit, and no rule had been served on him, nevertheless this process would protect the officer against any suit. The process will always protect a sheriff from suit, when it issues by order of

a court having authority of law to issue process of that nature, and where it is in legal form and on its face contains nothing to apprise the officer, that it issued without authority. See *Collins* v. *Munn et al.*, 15 W. Va., 171. The case cited by the appellees' counsel, of *Tevis* v. *Ellis et als.*, 25 Cal., 515, differs essentially from this. That was an execution or writ of restitution, as there called, in favor of a plaintiff against a defendant in an action of ejectment; and the court held, that such a writ only authorized the sheriff to turn out the defendant in the ejectment-suit or those claiming under him; and if he turned out a third party claiming the land adversely to the parties in the ejectment-suit, the sheriff would be a trespasser and liable to suit.

The other cases cited by appellees' counsel, *Kuhn, Netter & Co.* v. *Mack & Bros.*, 4 W. Va. 186, and *Walker* v. *Hunt*, 2 W. Va. 491, were cases, where executions issued against the goods of one person and were levied by the sheriff on the goods of another. In all these cases the sheriff did not, as in the case before us, obey the process in his hands but violated it by executing it against a person or against the goods of a person not named in the process. These were all cases obviously of trespass by the sheriff; and in the two last cases the trespass was the illegal sale of goods. The court very properly refused to enjoin, as it has always been held, that the depriving one of personal property is as a general rule adequately recompensed by damages; but it is widely different, when one is about to be improperly deprived of land. In such case the doctrine has always been, that damages would not adequately compensate one for the loss of his land. Nearly the whole jurisdiction of courts of equity in enforcing the specific execution of contracts is based on this well-recognized distinction between personal property and land. But, as we have seen, in this particular case the plaintiff could have had no redress for the wrong done him in a court of law, as he could not have maintained an action of trespass against the sheriff. The case of *Goodnough* v. *Sheppard*, 28 Ill. 81, is a direct authority for the awarding of an injunction in a case like the one before us. There is no question, that the proper course of proceeding on the part of the county court was to issue a rule against the plaintiff, Theodore A. William-

son, to show cause why he should not be compelled to give possession of this land to the purchaser, Russell; and if on the return of this rule it had appeared, that he was a tenant of William W. Williamson or in any manner claimed under him, the writ of *habere facias possessionem* should have been issued and enforced against him; but if it appeared, that he claimed the land by a title, which was adverse to that of William W. Williamson, no such writ should have issued. See *Newman* v. *Chapman*, 2 Rand. 106; *Commonwealth* v. *Rugsdale*, 2 H. & M. 8.

The county court in its decree ordering this *habere facias possessionem* to issue recited, "that it appeared to the court, that Theodore. A. Williamson, the tenant of the mortgager, W. W. Williamson a party to the suit, refused to surrender possession of the land to Joshua Russell, the purchaser from the commissioners." If this recital be true, the court did right in dissolving the injunction and dismissing the bill, though no rule had issued against Theodore A. Williamson, because, if this recital is true, no injury is sustained by him, though this *habere facias possessionem* ought not to have issued, before a rule was served on him. The principal question in the case is: Has the plaintiff any valid claim to this land as against William W. Williamson, or does he hold it only under him? There is no question, but that the plaintiff entered upon this land under the title of William W. Williamson and in subordination to it. Has the character of his possession since changed? That must depend on the question, whether he had under the circumstances shown in this case a right to purchase this land when sold for delinquent taxes, which had been assessed in the name of William W. Williamson.

Cooley on Taxation chapter 15, page 315 thus states the law: "Some persons from their relation to the cause or to the tax are precluded from becoming purchasers at a tax-sale by the sheriff. The title to be transferred at such sale is one based on the default of the person, who owes to the government the duty to pay the tax. But one person may owe this duty to the government, and another may owe it to the owner of the land. Such a case may exist, where the land is occupied by a tenant, who by his lease has obligated himself to pay taxes. Where that is the relation of the parties to the land,

it would cause a shock to the moral sense, if the law were to permit the tenant to neglect his duty and cut off the lessor's title by buying in the land at a tax-sale."

On the next page the author well says : "There is a general principle applicable to such cases; that a purchase made by one, whose duty it was to pay the taxes, shall operate as payment only; he shall acquire no rights as against a third party by a neglect of the duty, which he owed to such party. This principle is universal and is so entirely reasonable as scarcely to need the support of authorities. Show the existence of the duty, and the disqualification is made out in every instance." Many authorities are cited which fully support this position. Many authorities have gone so far as to assert the broad doctrine, "that when one is in possession, when the tax is assessed, it thereby becomes his duty to pay the taxes, and he could not permit the land to be sold for such taxes and obtain a tax-deed for the purpose of destroying an outstanding title, and that the mere fact of possession, when the taxes are assessed, is a disqualification to buy." See *Whitney* v. *Gunderson,* 31 Wis., 359, 379; *Basset* v. *Welch,* 22 Wis., 175; and a large number of cases more or less similar in principle cited by Cooley in note on page 349. But Cooley thinks these cases go too far; and I am not prepared to say they do not. But be this as it may, it is beyond dispute, that when one owes a duty to the owner of the land to pay the taxes, he is disqualified thereby from purchasing the land at a tax-sale made because of his delinquency in paying the taxes. Thus in *Haskel* v. *Putnam,* 42 Maine, 244, a tenant, who had agreed to pay a certain rent and the taxes, failed to pay the taxes, and the land was sold for the taxes. It was held, that he was disqualified from buying at such sale and could not set up his tax-title against his landlord.

This principle, which is sustained by all the authorities, suffices to determine the rights and duties of the plaintiff in the case before us. In stating the case I expressed the opinion, that the evidence in this case established it to be the duty of the plaintiff to his brother William W. Williamson, to pay the taxes on the land while he was his tenant. The land was sold for these taxes, which the plaintiff ought to have paid; and he was disqualified from purchasing at such sale and cannot

set up his tax-title against his brother, the landlord, or any one claiming under him. His payment at the tax-sale will be considered as a redemption of the land for his landlord, William W. Williamson, and he remained, as before, his tenant; and the county court had a right to dispossess him in said suit against William W. Williamson by a writ of *habere facias possessionem.* The circuit court therefore did not err in dissolving the injunction and disnissing the bill.

I would not be understood as implying, that it is necessary for the tenant expressly to agree to pay the taxes, before he can be in all cases disqualified from buying at a sheriff's sale for taxes, though, I doubt not, in some cases he would be at liberty to bid at such sale, where he had not agreed to pay the taxes, and where the facts and circumstances imposed on him no moral duty toward his landlord to pay such taxes. See *Bettison* v. *Budd*, 17 Ark. 546. On the other hand there are cases, where, I think, the tenant would be disqualified from buying the land at a tax-sale, though he had not agreed to pay the taxes; but it is unnecessary here to draw the line between these cases. See *Gaskin et al.* v. *Blake*, 37 Miss. 675.

It was claimed, that Mrs. Louisa E. Walker had under the 30th section of chapter 117 of Acts of 1872–3, page 324, one year from the death of her husband, within which to redeem this land. But there is nothing in this position. The assignment of the mortgage was made to her September 23, 1875, and though it was not said in the assignment, that it was for her sole and separate use, since April 1, 1869, such an assignment creates in this State a sole and separate estate, it being unnecessary in a deed or assignment, in order to create a separate estate, under our Code to do more than simply to convey or assign. See *Radford et al.* v. *Carwyle et al.*, 13 W. Va., syllabus 12, page 574. She was therefore never under any disability with reference to this land.

It was also insisted, that the tax-deed to the plaintiff conveyed no title, because this land was improperly assessed in the name of William Williamson and W. S. Caldwell, when in fact William W. Williamson owned the whole tract of forty-three acres, and W. S. Caldwell had only a mortgage on three acres of it and no title or claim of any sort on the remaining forty acres. Such a description of the ownership of

the land was certainly very erroneous. The inference drawn from the manner, in which the land was assessed and sold, would necessarily be, that both Williamson and Caldwell had some interest in the whole of these forty-three acres of land. The land ought to have been assessed in the name of Williamson alone. Had the mortgage of Caldwell been on the whole land, while the assessment and sale of it in the name of Williamson and Caldwell would have been an irregularity, yet, I suppose, it would have been covered by sec. 25, ch. 117 of the Acts of 1872–3, p. 321, which declares that no irregularity shall vitiate a tax-sale, "unless it be such an irregularity, as materially to prejudice the rights of the owner, whose real estate is sold, and it be clearly proven to the court or jury, that such delinquency has been exercised by the party, in whose name it was sold, that but for such irregularity the said party would have redeemed the same under the provisions of the 15th and 16th sections of this chapter."

It is difficult to say, what is meant by this section in saying, that to vitiate a deed it must be "clearly proven, that such diligence has been exercised by the party, in whose name it was sold, that but for such irregularity the said party would have redeemed the same." At first blush it would look, as if the Legislature intended, that no irregularity, however material it might on its face appear to be, or however clear it might be apparently, that it was such an irregularity as materially to prejudice the rights of the owner of the land, should vitiate the deed, unless the owner of the land sold introduced parol proof and clearly proved, that he had exercised diligence, and that despite his diligence he had been so deceived by this irregularity, that he was thereby prevented from redeeming this land. But it does seem to me impossible to give such a construction to this act. The object of our tax-laws in their liberality in sustaining tax-titles was to give confidence to purchasers from persons, who hold such tax-titles, that a deed apparently good, so far as the records showed, would not be set aside by the courts on account of some irregularity in the performance by the officers of the State of the many duties imposed upon them as preliminary to the obtaining of a tax-deed.

The provision in the Acts of 1873, chapter 117, section 25,

page 321, that the tax-deed should be vitiated by such irreg-ularities *only* "as appear on the face of the proceeding of record in the office of the clerk of the county court, and be such an irregularity as materially to prejudice the rights of the owner, whose real estate is sold" was evidently designed for this purpose : to enable a purchaser from one, who held a tax-deed, by a search of the county court clerk's office to as-certain with some degree of certainty, whether the tax-deed was or was not good.  If he could not do so, the land could not be sold, and a great public injury would result, as it would tend to prevent persons from buying and settling on these tracts of land sold for delinquent taxes, which were often very large, and the settlement of the State by actual occupants of her wild lands was thus seriously hindered.  This was the great evil intended to be corrected by our laws with reference to the sales of real estate for taxes.   But if we in-terpret this provision, which we have quoted, and which was introduced into our law for the first time in 1873, as mean-ing, that these tax-titles are to depend for their validity not solely on what appears on the face of the proceedings of record in the office of the clerk of the county but upon the parol proof, which the owner of the land might introduce, that he had used diligence, and that but for an irregularity in the proceedings he would have redeemed his land, we by such construction of the law would, it seems to me, introduce all the evils of uncertainty as to the validity of tax-deeds, which it was obviously the purpose of the law to remove.

If we so interpreted the law, no lawyer however able could ever safely pronounce after a careful examination of the records in the clerk's office of the county court, whether a tax-deed was or was not valid, as its validity would after all depend upon parol proof and largely upon what the owner of the land might swear to in giving his evidence.  If he was unscrupulous, he might swear, that but for some irregularity perhaps apparently very trifling he would have redeemed the land, and that he had been diligent in his enquiries; or on the other hand, if he was scrupulous, he might admit, that some gross irregularity, which would apparently materially prejudice his rights, did not in point of fact do so, as he had not been diligent in making enquiries and knew nothing of

the existence of such irregularity, till after the making of the tax-deed. Thus the untruthful owner of the land would succeed in setting aside a tax-deed, which on the face of the proceedings of record in the county court clerk's office was apparently a valid deed ; and the truthful tax-payer would fail to set aside a tax-deed, which on the face of the proceedings on record in the clerk's office of the county court was apparently an invalid deed.

Such results are so obviously unjust and in such obvious violation of the objects and purposes of our law with reference to the sale of lands for taxes as well as the whole spirit of our recording acts, that it seems to me, that a construction of our law, which necessarily tends to these results, cannot be adopted by the court. Parol proof must, it seems to me, if we would not introduce a highly mischievous innovation, be excluded, when we are enquiring, whether an irregularity appearing of record is material and prejudicial to the owner of the land and prevented him from redeeming the same. He must, as every other man must, be supposed to know what appears of record in the clerk's office in reference to his land, and if what so appears was calculated to mislead him and prevent him from redeeming his land, we must conclude, that it did so. We cannot permit parol proof on this subject to be introduced without rendering the validity of all tax-deeds far more uncertain, than they were before the passage of the act of 1873, the obvious object of which was to render them more certain.

If such an interpretation was adopted by the courts, it would often happen, that though the proceedings which appear of record in the clerk's office were precisely alike in two cases, yet in one of them the tax-deed would be held valid and the other invalid, the parol proof differing in the two cases. And this parol proof would often differ, though the real facts were the same, the owner in the one case admitting the real facts and in the other denying them ; and these facts, on which the validity of the tax-deed on this construction of this law would depend, are facts, which would generally be entirely in the knowledge of the owner ; and the validity of the tax-deed would thus ultimately depend on the honesty of the owner of the land. If honest he would lose his land ; and if dishon-

est he would retain it, setting aside the tax-deed by his own false statements.

I can not believe, that this is a proper mode of construing the law. The true construction is, that the courts must determine, whether the particular irregularity is such, as would mislead a man of ordinary intelligence, and was calculated to prevent him from redeeming his land and thus materially prejudice his rights. If the irregularity was of this character and would naturally produce this result, it vitiates the tax-deed ; otherwise, it does not,

Applying this rule to the irregularity in this case of taxing this forty-three acres of land as owned by Williamson and Caldwell, when it was owned by Williamson alone, and Caldwell had a mortgage on only three acres of it and no interest in the other forty acres, was it such an irregularity, as was calculated to mislead Williamson as a reasonable man and prevent him from redeeming his land, or his creditors from doing it for him? It seems to me, that it was well calculated to mislead and to produce such result; and therefore as it appeared of record in the county court's clerk's office, it would vitiate the tax-deed. But as it is unnecessary to determine this point in this case, I do decline to express a positive opinion in regard to it and will leave it to be finally determined, when a case arises, in which it becomes necessary to decide it. The importance of the principle involved in its determination induces me to waive its definite decision now, and let it remain an open question, till it becomes necessary in some other case to determine it definitely.

For the reasons I have stated the decree of the circuit court dissolving the injunction and dismissing the plaintiff's bill must be affirmed ; and the appellees must recover of the appellant their costs in this Court expended and $30.00 damages.

JUDGES JOHNSON AND HAYMOND CONCURRED.

DECREE AFFIRMED.